**Dennis KOHL, by his parents and guardians, Norbert KOHL and Jean Kohl, Plaintiff,**

v.

**WOODHAVEN LEARNING CENTER, a corporation, and Woodhaven School, Inc., a corporation, Defendants.**

**No. 86–4234–CV–C–5.**

United States District Court, W.D. Missouri, C.D.

Sept. 25, 1987.

See also, 672 F.Supp. 1221.

Joel Ferber, Ann B. Lever, Legal Services of Eastern Missouri, Inc., St. Louis, Mo., for plaintiff.

Robert C. Smith, Smith, Lewis & Beckett, Columbia, Mo., for Woodhaven Learning Center.

Marvin E. Wright, Knight, Ford, Wright, Atwill, Parshall & Baker, Columbia, Mo., for Woodhaven School, Inc.

## ORDER AND MEMORANDUM

SCOTT O. WRIGHT, Chief Judge.

Plaintiff has instituted this action under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, against defendants Woodhaven Learning Center and Woodhaven School, Inc. Plaintiff is a thirty-one-year-old man who is mentally retarded, bilaterally blind, exhibits behavioral problems which include scratching and biting, and has been diagnosed as an active carrier of hepatitis B.

Beginning in October, 1983, plaintiff's parents and legal guardians sought residential placement and training services for plaintiff at Woodhaven School and Woodhaven Learning Center. Plaintiff contends that although he was found to be appropriate for residential and day training programs at Woodhaven Learning Center and Woodhaven School, plaintiff was not accepted for permanent placement in either

program because of his condition as an active carrier of hepatitis B.

From May 18, 1987 through May 22, 1987, a bench trial was held before this Court. Based on the following findings of facts and conclusions of law, the Court concludes that defendants Woodhaven Learning Center and Woodhaven School, Inc. have violated plaintiff's rights under Section 504 of the Rehabilitation Act, and that plaintiff is entitled to declaratory and injunctive relief.[1]

## I. Findings of Fact

1. Plaintiff Dennis Kohl is a citizen of the United States who presently resides at Northwest Habilitation Center of the Missouri Department of Mental Health ("DMH") located in St. Louis County, Missouri. He is thirty-two-years old. Plaintiff brings this action by and through his parents and legal guardians, Norbert Kohl and Jean Kohl.

2. Defendant Woodhaven Learning Center is a not-for-profit corporation organized and existing under the laws of the State of Missouri. Woodhaven Learning Center is a life-skills and living quarters facility which provides residential placement to handicapped individuals. It is located in Columbia, Missouri.

3. Defendant Woodhaven School, Inc. is a not-for-profit corporation organized and existing under the laws of the State of Missouri. Woodhaven School, Inc. is a habilitation facility which provides educational, pre-vocational, and vocational day programs for handicapped individuals. It is located in Columbia, Missouri.

4. This Court has jurisdiction under 28 U.S.C. § 1331 and 1343(a)(4) in that plaintiff's claim arises under 29 U.S.C. § 794. Venue is proper in this Court under 28 U.S.C. § 1391(b).

5. Plaintiff is mentally retarded, bilaterally blind, and has been diagnosed as an active carrier of hepatitis B. As part of his physical and mental impairments, plaintiff exhibits behavior problems which include scratching and biting.

6. Plaintiff's physical and mental impairments substantially limit his ability to care for himself, perform manual tasks, see, speak, learn and work.

7. In 1983, the community placement committee of the DMH recommended referring plaintiff to Woodhaven Learning Center and Woodhaven School because they served blind individuals, and plaintiff, as a blind retarded individual, had needs which the Department's private vendors in the St. Louis area could not meet.

8. In the October 5, 1983 individual habilitation plan (IHP) for plaintiff, prepared by his DMH case manager and staff from Colonial Town where he was then residing, the deaf/blind and day programs of Woodhaven Learning Center and Woodhaven

---

1. Defendants attempt to raise, for the first time in their Joint Post-trial Brief, that this Court lacks jurisdiction in this case based on the doctrine of primary jurisdiction, and plaintiff's failure to exhaust state and federal administrative remedies. However, for a number of fundamental reasons, defendants' jurisdictional challenge must be denied.

First, the essence of defendants' jurisdictional challenge is that since plaintiff has failed to exhaust state and federal administrative remedies, then this Court lacks subject matter jurisdiction. However, since defendants have failed to raise such a defense in their answers, in their motions to dismiss or in their motions for summary judgment, then defendants' belated, post-trial jurisdictional challenge is barred by the doctrines of waiver and estoppel. *See Zipes v. Trans World Airlines,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) (Held that timely compliance with the administrative deadlines in Title VII was not a jurisdictional prerequisite to

suit in federal court, but a requirement subject to waiver, estoppel, equitable tolling, and so on); *Williams v. Casey,* 657 F.Supp. 921 (S.D.N.Y. 1987) (Noncompliance with exhaustion requirements does not deprive district court of subject matter jurisdiction).

Second, as noted by plaintiff in his reply brief, there are no state and federal administrative remedies which plaintiff and his parents could have exhausted in this case. *See e.g.* Mo. Rev.Stat. § 633.120.3 (1986) (which makes clear that the Department of Mental Health cannot force the head of a *private* mental retardation facility to admit a client referred by a regional center). *See also Miener v. State of Missouri,* 673 F.2d 969, 978 (8th Cir.), *cert. denied* 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982) (Exhaustion of federal remedies is not a prerequisite to § 504 suits which do not involve federal government employment discrimination since administrative remedies are of little avail to the individual plaintiff).

School were identified as the least restrictive environment for plaintiff.

9. In October of 1983, Mike McCarthy, an employee of Woodhaven School, Inc., observed plaintiff at Colonial Town for the purpose of determining whether plaintiff was appropriate for referral to Woodhaven School, Inc.

10. Plaintiff's Department of Mental Health case manager informed Mike McCarthy that plaintiff had hepatitis B and provided McCarthy with a report on hepatitis prepared by Dr. Mohammed Ahkter of the DMH.

11. Between October 11, 1983 and February 7, 1984, plaintiff's parents and his Regional Center case manager completed the process of applying on plaintiff's behalf to Woodhaven Learning Center. The records provided to Woodhaven Learning Center as part of his application identified him as a hepatitis B carrier and as exhibiting some maladaptive behavior.

12. On or about March 27, 1984, the Admissions and Discharge Committee of Woodhaven Learning Center placed plaintiff on a waiting list for evaluation for residential placement and daily skills training in the deaf/blind program located in the Parmly Building at Woodhaven Learning Center.

13. A representative of Woodhaven School, Inc. sat on the Admissions and Discharge Committee which placed plaintiff on the waiting list for Woodhaven Learning Center.

14. The nurse for Woodhaven Learning Center also sat on the Admissions and Discharge Committee which placed plaintiff on the waiting list for Woodhaven Learning Center.

15. On July 10, 1984, Woodhaven Learning Center informed Mr. and Mrs. Kohl that plaintiff would be admitted to the deaf/blind program at Woodhaven for evaluation beginning July 16, 1984.

16. On or about July 24, 1984, the Woodhaven Learning Center staff designed an IHP for plaintiff in which the objectives were independent dressing, independent bathing, independent wall-trailing to the dining room, and reducing his maladaptive behaviors by 50% by August of 1985.

17. On or about August 16–18, 1984, a certified vocational evaluator of Woodhaven School, Inc. evaluated plaintiff for services at the Occupational Resource Center of Woodhaven School, Inc.

18. The summary of the vocational evaluation on plaintiff by Woodhaven School, Inc. stated:

> "Dennis' lack of formal educational or vocational program has resulted in a very severe deficit in the knowledge of, or skills required for a work setting. His willingness to allow physical manipulation and his cooperation with the instructor during the vocational evaluation, however, makes him a good candidate for vocational intervention."

19. On September 10, 1984, James Michael, the Assistant Executive Director of Woodhaven Learning Center, wrote Nancy Shrewsbury, the DMH case manager for plaintiff, stating that plaintiff "was determined to be appropriate for residential as well as vocational programs offered by Woodhaven Learning Center and the Occupational Resource Center" of Woodhaven School, Inc. In the same letter, however, Michael set an October 26, 1984 dismissal date for plaintiff from Woodhaven Learning Center because the Occupational Resource Center would not accept plaintiff in its day program without a screening and inoculation of its clients and staff for hepatitis B.

20. On September 10, 1984, Woodhaven Learning Center dismissed plaintiff because the Occupational Resource Center of Woodhaven School, Inc. refused to provide a day program for him without a screening and inoculation program for its staff.

21. In May, and again July, 1985, Woodhaven Learning Center staff informed Mr. and Mrs. Kohl that plaintiff could return to the Learning Center when the immunization of residents was complete.

22. On December 4, 1985, the Executive Director of Woodhaven Learning Center refused to readmit plaintiff, stating that:

"On July 24, 1985, we contacted you regarding Dennis' readmission to Woodhaven Learning Center. At that time there was no day program available for him. We, Woodhaven Learning Center, no longer have the immuned staff in our employee [sic] to work directly with your son.

"It will be our policy not to accept hepatitis carriers in our residential population until a time when funds are made available to innoculate [sic] contact staff."

The only reason given at that time for refusing to allow plaintiff to return to Woodhaven Learning Center was his status as an active carrier of hepatitis B.

23. Now and in 1985, both Woodhaven Learning Center and the Occupational Resource Center of Woodhaven School, Inc. accepted clients with behavior management problems.

24. Woodhaven Learning Center and Woodhaven School were concerned with plaintiff's maladaptive behaviors only because they increased the risk of his transmitting hepatitis B.

25. On August 1, 1985, Woodhaven School, Inc. adopted a policy on hepatitis B which stated:

"Policy: It is the policy of Woodhaven School, Inc. not to discriminate against students/clients that have been referred for services solely on the basis of being an active carrier of Hepatitis B.

"Comments:

1. If a student/client has been determined appropriate for services at Woodhaven School, Inc. following a comprehensive evaluation and an interdisciplinary team meeting, and if that student/client is an active carrier of Hepatitis B and determined to exhibit aggressive or maladaptive behaviors that would present a clear and present danger of transmission of the disease to those staff in direct contact with him/her, Woodhaven School, Inc. will require the referring agency and/or funding source to provide necessary reimbursement for protecting the staff designated to work directly with that student/client.

2. The reimbursement associated with taking additional and necessary precautions for serving such students, is above the regular costs established for services at Woodhaven School, Inc.

3. The reimbursement will be for costs associated with the screening and inoculation of all those staff and volunteers designated to serve the student/client."

26. On November 21, 1985, the Executive Director's Report for Woodhaven School, Inc. stated:

"As reported earlier, we have requested funding to screen and innoculate [sic] staff expected to work with the active carrier of hepatitis B. The referral (or funding) agency has balked at this request, and as a result, we have not admitted an infectious carrier into our program."

27. The sole reason for excluding plaintiff from Woodhaven School, Inc. was his diagnosis as an active carrier of hepatitis B.

28. Hepatitis B is an inflammation of the liver due to infection with the hepatitis B virus. In most cases, the inflammation results in a flu-like illness so mild that it will not be brought to the attention of a physician. In other cases, hepatitis B can cause liver disease and liver cancer. The fatality rate for reported cases of the disease is less than 1%.

29. Some 5–10% of hepatitis B cases can develop chronic infection or carrier status. A carrier is an individual who tests positive for surface antigen for longer than three to four months. Individuals who have an active case of hepatitis B and carriers who are chronically infected can transmit the disease to susceptible individuals.

30. Hepatitis B is transmitted by body fluid to body fluid—by blood, saliva, and other body fluids and secretions. It is transmitted by the body fluids of the carrier entering the bloodstream of another individual through a scratch, open wound, or cut. A microscopic skin lesion is sufficient to allow the transmission of the disease, and a very small amount of secretion is all that is necessary. The virus can exist at

room temperature, and can remain on physical surfaces for long periods of time.

31. A great majority of people receiving a known exposure to the body fluid of an affected individual will not come down with hepatitis B.

32. Hepatitis B is not spread by casual contact or association with a carrier. It is not transmitted through the air by a cough or sneeze.

33. Carriers of hepatitis B may, but do not necessarily, remain carriers all of their lives. Approximately 1% of carriers spontaneously lose their carrier status each year, in which case all evidence of infection disappears and the infection is in permanent remission.

34. Carriers of hepatitis B do not have the same level of infectiousness. A carrier's level of infectiousness can be measured by a blood test known as the antigen test. A carrier who tests e antigen positive is 3– to 4–fold more infectious than a carrier who tests e antigen negative. Between 5 and 10% of all carriers per year will go from e antigen positive to e antigen negative.

35. In tests administered from July, 1983 through November, 1985, plaintiff was e antigen positive. In September of 1986, plaintiff tested e antigen negative. Again, in May of 1987, plaintiff was e antigen negative, meaning that he is now less infectious.

36. The mentally retarded and other institutionalized individuals have been recognized as a group with a higher level of hepatitis B infection, carrier status and evidence of past infection than those in the general population. Thus, institutionalized settings present the greatest opportunity for the disease to be transmitted.

37. There is a highly effective pre-exposure vaccine for hepatitis B. In a general range of the population, it confers immunity at a 85–95% rate. Among young and middle-aged individuals, the vaccine is 95–99% effective.

38. The side effects or risks associated with the vaccine are minimal. Less than 5% of those vaccinated will develop a low-grade fever and some irritation at the point of injection. There is no risk of picking up any other infectious agent through the vaccine.

39. There is a post-inoculation blood test which shows whether an inoculated individual has developed a sufficient level of protective antibody to fight off the hepatitis B virus. When individuals have developed sufficient levels of protective antibody, they will not get hepatitis B even from a bite or scratch of a hepatitis B carrier.

40. There is also an effective post-exposure prophylaxis which can be administered to unimmunized individuals who experience a significant exposure to the hepatitis B virus. The product is known as hepatitis B immune globulin.

41. The per person cost of inoculation was $100 in 1985 and currently is about $150 to $175. The per person cost of post-inoculation screening is currently $20 to $25.

42. As of the date of trial, Woodhaven Learning Center had 179 clients, of which 153 are clients of DMH. Woodhaven Learning Center has approximately 300 employees.

43. During the year of 1987, Woodhaven School, Inc. has employed approximately 80 individuals. Currently, there are approximately 61 clients being served by Woodhaven School, Inc. at its Occupational Resource Center.

44. DMH, as a matter of policy, requires all employees of its habilitation and residential centers, irrespective of whether they had direct care responsibilities of the clients, to either be screened and inoculated for protection from hepatitis B, or to sign a waiver of liability. In addition, all DMH clients are screened and inoculated for hepatitis B at DMH's expense. In 1983, DMH requested and received a $1.2 million emergency appropriation from the Missouri Legislature to cover expenses of the screening and inoculation of DMH employees and clients. Since that time, this function has been deemed so important to protect staff and clients that money for this screening

and inoculation has been included as part of DMH's core budget.

45. Woodhaven Learning Center participated in the screening and inoculation programs that DMH implemented for its clients in private placements. At Woodhaven Learning Center, the screening was done in February of 1985, at which time 162 DMH clients and 43 other residents were screened. Only one other carrier of hepatitis B was identified, and he has since left Woodhaven Learning Center. The immunizations at Woodhaven Learning Center were begun in July, 1985 and completed in January, 1986.

46. At Woodhaven Learning Center, all of the clients have been or will be vaccinated against hepatitis B. As of April 10, 1987, 168 residents at Woodhaven Learning Center had been inoculated and 16 had not. By the time of trial, the center had begun inoculation of the remaining 16 residents.

47. At the present time, plaintiff would be the only identified carrier of hepatitis B at Woodhaven Learning Center.

48. At the present time, 3 of 61 clients at the Occupational Resource Center do not have immunity to hepatitis B.

49. Woodhaven School, Inc. currently has one client who is an identified carrier of hepatitis B.

50. It would cost Woodhaven Learning Center approximately $45,000 to buy enough serum to inoculate all 300 of its employees. Additionally, the cost for screening for the same 300 employees would be approximately $7,500.

51. It would cost Woodhaven School, Inc. approximately $12,000 to inoculate all of its employees. Additionally, the cost for screening these employees would be approximately $2,000.

52. Since the annual rate of turnover of employees was approximately 75% at Woodhaven Learning Center and approximately 50% with respect to aides at Woodhaven School, Inc., then an additional expenditure would be required each year for the inoculation of new employees.

53. According to Dr. Donnell, a public health official who heads up the Missouri Department of Health's Section of Epidemiological Services, which is responsible for the control of hepatitis B and other communicable diseases, the Department of Health's recommendation on inoculation of staff in programs for the mentally retarded is conditionally stated so that no program would expect that their entire staff should be immunized. The number of staff who should be vaccinated depends on such factors as whether there are carriers in the population, the number of carriers, and the likelihood of transmission.

54. In the individual circumstances presented by this case where plaintiff would be the only identified carrier at Woodhaven Learning Center, it was Dr. Donnell's opinion that a barrier of protection could be built between plaintiff and unimmunized staff by vaccinating those staff who would have continuous and direct contact with plaintiff. The recommendation was the same for the day program at the Occupational Resource Center, i.e. to inoculate those staff with continuous, frequent, and extensive contact with plaintiff.

55. In addition to immunizing the staff with frequent extensive contact with plaintiff, Dr. Donnell also recommended vaccinating those supervisors or other staff who would normally be used as backup in emergency situations. Furthermore, Dr. Donnell recommended post-inoculation screening to confirm the development of immunity in those staff involved with plaintiff's routine care.

56. In the medical opinion of Dr. Perrillo, the fact that plaintiff would be the only carrier at Woodhaven Learning Center and one of only two carriers at Woodhaven School, Inc., and that the physical layout of both programs would obviate the need for most staff to have physical contact with plaintiff means that immunization would be required only for those staff having routine hands-on contact with plaintiff.

57. The deaf/blind program in which plaintiff would have been placed at Woodhaven Learning Center is located in the Parmly Building. The Parmly Building is a separate and distinct one-story building lo-

cated on the Woodhaven Learning Center campus. It has its own dining room and kitchen, and only its residents eat there. The dining room, kitchen, and small television room occupy the center of the Parmly Building and on either end are two living areas or wings. In the basement, there are two recreation rooms. Each of the two wings has its own central day-room or common area with double-occupancy bedrooms opening into the day-room. Every two bedrooms share a bath. There is also a laundry room in each wing.

58. At the Occupational Resource Center, clients are assigned to specific tables on the production floor which serve as the client's work place. The Occupational Resource Center is partitioned into 5 areas—an office area, work activities center, a break or lunch area, a workbench area, and an area where clients work on word-processing equipment.

59. In Dr. Perrillo's opinion, Woodhaven Learning Center could have eliminated any significant risk that plaintiff would transmit hepatitis B to unimmunized staff by vaccinating the life skills instructors who would have routine physical contact with plaintiff, the supervisory staff in his building, the LPN assigned to his wing of the building, and the nurse and doctor providing patient care at the Learning Center.

60. In Dr. Perrillo's opinion, the Occupational Resource Center of Woodhaven School, Inc. could have eliminated any significant risk that plaintiff would transmit hepatitis B to unimmunized staff by vaccinating the vocational instructor and aides who would implement plaintiff's program, a staff person for replacement during absences and vacation, and the monitors on the bus he would ride from the Learning Center to the day program.

61. Like Dr. Donnell, Dr. Perrillo recommended post-inoculation screening for those staff having routine hands-on contact with plaintiff and encouraging anyone who did not develop sufficient levels of protective antibody to work in areas away from plaintiff.

62. Dr. Perrillo also recommended that other non-direct contact staff, like janitorial

and housekeeping staff, would not need to be immunized since their risk of exposure could be minimized by wearing gloves when handling plaintiff's belongings, and by properly marking and labeling these items.

63. According to a one-week staffing pattern for the west wing of the Parmly Building (the building in which plaintiff would have been assigned) at Woodhaven Learning Center, 19 people are required to provide direct care in a 1:3 staff-to-client ratio. That ratio necessitates more staff than the 1:4 staff-to-client ratio required by state licensing rules.

64. At the present time, there are 5 supervisory staff in the Parmly Building. In the past, there were 6 supervisory staff. Approximately 16 to 20 residents live in each wing of the Parmly Building.

65. In 1985, it would have cost Woodhaven Learning Center $4,600 to inoculate and screen the routine hands-on staff designated to work directly with plaintiff and to screen for immunity.

66. It would cost Woodhaven Learning Center $6,500 at the present time to inoculate and screen the routine hands-on staff designated to work directly with plaintiff and to screen for immunity the clients who live in a wing of the Parmly Building with plaintiff.

67. According to the Assistant Executive Director of Woodhaven Learning Center, it had a turnover rate of 75% of its employees in 1986. It would cost Woodhaven Learning Center $4,400 per year to inoculate and screen 75% of the newly employed, routine hands-on staff designated to work directly with plaintiff.

68. The base budget of Woodhaven Learning Center is $4 million per year.

69. In a September 25, 1985, meeting with DMH officials and others, Mark Hassemer of Woodhaven School, Inc. admitted that 1 vocational instructor, 1 aide and 1 person to fill in for absences and vacations would have been designated to work directly with plaintiff.

70. In a telephone conversation with plaintiff's mother, Hassemer admitted that 3 or 4 Woodhaven School, Inc. employees would need to be inoculated to work directly with plaintiff.

71. In 1985, it would have cost Woodhaven School, Inc. $500 to inoculate and screen the staff designated to work directly with plaintiff.

72. Currently, it would cost Woodhaven School, Inc. $1600 to inoculate and screen the staff designated to work directly with plaintiff and to inoculate and screen the 3 unimmunized clients at the Occupational Resource Center.

73. Woodhaven Learning Center receives federal financial assistance through Social Security or Supplemental Security Income benefits paid on behalf of residents at the center. It received $431,538.61 in such benefits in 1984, $474,398.06 in 1985, $452,719.49 in 1986 and, through February of 1987, $57,614.49 in such benefits.

74. Woodhaven Learning Center retains an operational checking account in Boone County National Bank, Columbia, Missouri. Woodhaven Learning Center deposits revenues and receipts for services provided to residents into said operational fund account. Woodhaven Learning Center uses money from said account to pay for salaries of Woodhaven Learning Center employees, residents' food, material for residents' programs, repairs for buildings and all other kinds of operational activities at Woodhaven Learning Center.

75. Woodhaven School, Inc. receives federal financial assistance through the Missouri Department of Mental Health from Title XX Social Services block grant program. For the 1987 fiscal year, Woodhaven School, Inc. received $247,204.46 in Title XX funds as of May 19, 1987. In fiscal year 1986, it received $72,710.91 in such funds, $22,716.62 in 1985, and $46,-256.51 in 1984.

76. Woodhaven School, Inc. has also received federal financial assistance in the following amounts:

TITLE VI–C FUNDS FROM THE MISSOURI DEPARTMENT OF ELEMENTARY AND SECONDARY EDUCATION:

| | |
|---|---|
| 10/1/83 to 9/30/84 | $51,000 |
| 10/2/84 to 9/30/85 | 55,277 |
| 10/1/85 to 9/30/86 | 38,583 |
| 10/1/86 to 9/30/87 | 37,642 |
| Total VI–C | $182,502 |

HELEN KELLER NATIONAL CENTER:

| | |
|---|---|
| 10/1/83 to 9/30/84 | $ 17,960 |
| 10/1/84 to 9/30/85 | 13,769 |
| 10/1/85 to 9/30/86 | 7,917 |
| 10/1/86 to 9/30/87 | None |
| Total Helen Keller National Center | $ 39,646 |

HELEN KELLER NATIONAL CENTER TAC:

| | |
|---|---|
| 10/1/86 to 3/31/87 | $ 20,767 |
| | $ 60,413 |

BUREAU FOR THE BLIND:

| | |
|---|---|
| January, 1983 through June 30, 1986 | $ 73,714 |

77. Woodhaven School, Inc. maintains a checking account in Boone County Bank, Columbia, Missouri, for all its operational expenses. Woodhaven School, Inc. deposits all money received for provision of educational, vocational, therapeutic, and other services provided into this operational checking account.

78. The operational expenses paid for out of said checking account include payment for rent, school supplies and all other day-to-day expenses of Woodhaven School, as well as payment to the electronic data processing firm that pays Woodhaven School employees.

## II. Conclusions of Law

In 1973, Congress enacted the Rehabilitation Act to "develop and implement, through research, training, services, and the guarantee of equal opportunity, comprehensive and coordinated programs of vocational rehabilitation and independent living." 29 U.S.C. § 701. The guarantee of equal opportunity for handicapped individuals is contained in Section 504 of the Act which provides that:

"No otherwise qualified individual with handicaps ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ..." 29 U.S.C. § 794 (Supp.1987).

## A. *Dennis Kohl is a Handicapped Individual Within the Meaning of the Rehabilitation Act and its Implementing Regulations*

In 1974, Congress expanded the definition of "handicapped individual" protected from discrimination by Section 504. That definition includes:

"Any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 706(7)(B).

The federal regulations implementing Section 504 define "physical or mental impairment" as:

"(A) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine; or (B) any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 45 C.F.R. § 84.3(j)(2)(i).

In addition, the regulations define "major life activities" to include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 45 C.F.R. § 84.3(j)(2)(ii).

In denying defendants' motions for summary judgment and for judgment on the pleadings, this Court concluded that "plaintiff, by reason of being diagnosed as an active carrier of ... Hepatitis B, is a 'handicapped individual' as that term is used in 29 U.S.C. § 706(7)(B), since plaintiff is regarded as having such an impairment ..." Order, May 18, 1987 at p. 8–9 ("Order"). The Court's conclusion is consistent with the recent Supreme Court decision in *School Board of Nassau County, Florida v. Arline*, — U.S. —, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). In *Arline*, the Supreme Court held that an individual suffering from the contagious disease of tuberculosis was a "handicapped individual" within the meaning of Section 504. *Id.* at —, 107 S.Ct. at 1130. The Supreme Court found that plaintiff had a physical impairment since tuberculosis affected her respiratory system, and that her hospitalization for tuberculosis was sufficient to establish a record of an impairment within the meaning of § 504.

This Court found that *Arline's* analysis of the legislative history behind § 504 lends support to the conclusion that a person with a contagious disease like hepatitis B, while not physically impaired by it, is a "handicapped individual" within the meaning of the Act. When Congress in 1978 amended the definition of "handicapped individual," it meant "to preclude discrimination against '[a] person who has a record of, or is regarded as having, an impairment [but who] may at present have no actual incapacity at all." *Arline*, — U.S. at ——, 107 S.Ct. at 1126–27, *quoting Southeastern Community College v. Davis*, 442 U.S. 397, 405–406 n. 6, 99 S.Ct. 2361, 2366–2367 n. 6. By including those regarded as being impaired in its definition of "handicapped individual," it is clear that

"Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment. Few aspects of a handicap give rise to the same level of public fear and misapprehension as contagiousness. Even those who suffer or have recovered from such noninfectious diseases as epilepsy or cancer have faced discrimination based on the irrational fear that they might be contagious. The Act is carefully structured to replace such reflexive reactions to actual or perceived handicaps with actions based on reasoned and medically sound judgments ..." *Arline*, — U.S. at ——, 107 S.Ct. at 1129.

Construing § 504 to include those with contagious diseases is consistent with the basic purpose of the Act "which is to ensure that handicapped individuals are not denied

jobs or other benefits because of the prejudiced attitudes or the ignorance of others." *Id.*

The regulations promulgated by the Department of Health and Human Services similarly indicate that a person suffering from a contagious disease without any physical impairment is a "handicapped individual" under § 504. Section 84.3(j)(2)(iv) defines the statutory phrase "regarded as having an impairment" to mean

"(A) has a physical or mental impairment that does not substantially limit major life activities but that is treated by a recipient as constituting such a limitation; (B) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others towards such impairments; or (C) has none of the impairments defined in paragraph (j)(2)(i) of this section but is treated by the recipient as having such an impairment." 45 C.F.R. § 84.3(j)(2)(iv).

■ As a carrier of hepatitis B, Dennis Kohl is a "handicapped individual" within the meaning of § 504. Hepatitis B is a physiological disorder or condition which affects his hemic, digestive, and endocrine systems. His carrier status means that the hepatitis B virus is in his liver and produces viral particles found in his blood and other body fluids.

Like the plaintiff in *Arline,* Dennis Kohl also has a "record" of a physical impairment which substantially limits his major life activities. Since the summer of 1983, he has repeatedly been tested and diagnosed as a hepatitis B carrier. He has had hepatitis B because one cannot become a hepatitis B carrier without having had the hepatitis B viral infection. Furthermore, plaintiff was previously denied admission to a training program because of his hepatitis B carrier status. In 1983, the St. Louis Association for Retarded Citizens refused to accept plaintiff for its adult developmental day program, thereby substantially impairing his ability to learn and work.

More importantly, plaintiff "is regarded as" having a physical impairment which substantially impairs his ability to learn and work. Defendants Woodhaven Learning Center and Woodhaven School, Inc. provide daily living skills and vocational training. Defendants denied him access to that training "primarily as a result of the belief by those at the facilities that ... [his] condition poses a threat to third parties within the facility." Order, p. 8. Thus, defendants have treated plaintiff as having an impairment and have substantially limited his ability to learn and work as a result of their attitudes toward his carrier status. Therefore, the Court concludes that plaintiff is a "handicapped individual" within the meaning of Section 504.

### B. *Defendants Discriminated Against Dennis Kohl Solely on the Basis of his Hepatitis B Carrier Status*

As previously noted, Section 504 prohibits discrimination against an otherwise qualified handicapped individual solely on the basis of his handicap. In this case, the Court concludes that defendants have excluded plaintiff from their programs "solely by reason of" his status as a hepatitis B carrier.

In several key documents, Woodhaven Learning Center admitted that plaintiff was appropriate for their programs and that they excluded him solely because of his carrier status. On September 10, 1984, the Assistant Executive Director of Woodhaven Learning Center, James Michael, wrote plaintiff's case manager and stated that "[b]oth the residential and day program evaluations were completed and he was determined to be appropriate for the residential as well as vocational programs offered by Woodhaven Learning Center and the Occupational Resource Center." Plaintiff's Exhibit 16. Michael made no indication that plaintiff's behavior problems rendered plaintiff ineligible or inappropriate for Woodhaven Learning Center's programs. Michael stated that the reason for dismissal at that time was that Woodhaven School, Inc. refused to provide a day program for him "without a screening and inoculation program for its staff."

However, subsequent statements by Woodhaven Learning Center employees indicated that it was plaintiff's carrier status and not Woodhaven School's refusal to provide a day program which led to his dismissal and would determine his readmission. In May and again in July, 1985, Woodhaven Learning Center staff informed the Kohls that hepatitis B immunization was underway for Learning Center residents and that plaintiff could return there after completion of the immunization process. Plaintiff's Exhibits 4 and 5. In other words, once the risk of infectivity from plaintiff's hepatitis B was addressed by the residents' immunization, Woodhaven Learning Center was prepared to readmit him regardless of his behavior problems or the availability of a day program. Woodhaven Learning Center, however, did not readmit plaintiff after its residents' immunization; rather, the basis for excluding him then became the need to inoculate contact staff against hepatitis B. As Charles Brewer admitted to the Kohls, "[i]t will be our policy not to accept hepatitis carriers to our residential population until a time when funds are made available to innoculate [sic] contact staff." Plaintiff's Exhibit 6. Again, Brewer did not mention the lack of a day program or plaintiff's behavior problems. Even though Brewer testified at trial that Woodhaven Learning Center was beginning to exclude some clients with serious behavior problems at that time, he did not mention those changes as a basis for their decision to exclude plaintiff. The only stated reason for refusing to allow plaintiff to return to Woodhaven Learning Center was his hepatitis B and the costs involved in inoculating contact staff.

The basis for discrimination is equally clear on the part of Woodhaven School, Inc. Like Woodhaven Learning Center, Woodhaven School, Inc. also found that plaintiff was a good candidate for its vocational intervention program. Plaintiff's Exhibit 17. Woodhaven School, Inc. attached an addendum to its vocational evaluation which was later mailed separately to plaintiff's case manager. The addendum focused on plaintiff's status as an active carrier of hepatitis B and information described in a Department of Mental Health information packet on hepatitis B. Plaintiff's Exhibit 33. The addendum stated that "because of the precautions required in handling a hepatitis B carrier, Dennis' aggressive behaviors, the behaviors of the individuals in ORC's programs and the current status of DMH's screening and inoculation program, the Occupational Resources Center presently cannot accept Dennis as an active client." Plaintiff's Exhibit 33. While the report certainly mentions plaintiff's behavior problems, it is clear that Woodhaven School, Inc. was concerned with his maladaptive behaviors only because they increased the risk of him transmitting hepatitis B. Furthermore, the addendum reveals that behavior problems *per se* did not disqualify clients for the ORC programs; on the contrary, the addendum indicates that other clients at Woodhaven School had behavior problems which might also have heightened the risk of transmission.

The most succinct statement of the basis for Woodhaven School, Inc.'s denial of plaintiff into its program is contained in its policy on hepatitis B and the Executive Director's report for November 21, 1985. In his report, Hassemer wrote: "[a]s reported earlier, we have requested funding to screen and innoculate [sic] staff expected to work with the active carrier of Hepatitis B. The referral (or funding) agency has balked at this request, and as a result, we have not admitted an infectious carrier into our program." Plaintiff's Exhibit 32. In other words, Woodhaven School, Inc. refused to admit plaintiff because it would not pay and could not find another source to pay for inoculating the staff designated to work with plaintiff. No other reasons for the decision were mentioned. In its official policy, Woodhaven School, Inc. stated that it was requiring the agency referring a hepatitis B carrier with maladaptive behaviors to pay Woodhaven School, Inc. for the cost of protecting the staff designated to work with the carrier. By predicating admission on reimbursement for inoculating the direct contact staff, Woodhaven School, Inc. made clear that its concern

was with plaintiff's status as a hepatitis B carrier and the cost of inoculation.

Thus, the Court concludes that plaintiff was denied admission to both Woodhaven Learning Center and Woodhaven School, Inc. solely on the basis of his status as a carrier of hepatitis B.

C. *Defendants are Recipients of Federal Financial Assistance within the Meaning of Section 504*

Section 504 of the Rehabilitation Act prohibits discrimination by recipients of Federal financial assistance. 29 U.S.C. § 794. The regulations define "recipient" to include "any state or its political subdivision, any instrumentality of a state or its political subdivision, any public or private agency, institution, organization or other entity, or any person to which federal financial assistance is extended directly or through another recipient." 45 C.F.R. § 84.3(f). Both Woodhaven Learning Center and Woodhaven School, Inc. are private entities which receive substantial amounts of federal funding directly or through another recipient.

■ Defendant Woodhaven Learning Center has stipulated that it receives federal financial assistance. *See* Plaintiff's Exhibit 1, Part I, ¶ 6. Specifically, it receives Social Security or Supplemental Security Income (SSI) benefits for residents at the Center. For the 1987 fiscal year, Woodhaven Learning Center had received $57,614.49 (through February, 1987) in Social Security or SSI benefits. It received $457,719.49 in such benefits in 1986, $474,398.06 in 1985, and $431,538.61 in 1984. *Id.* Woodhaven Learning Center deposits its revenues and receipts for services to its residents in an operational checking account, and funds from that account are used to pay for the Center's services and programs. See *Id.*, ¶ 9.

■ Defendant Woodhaven School, Inc. also receives federal financial assistance. Through the Missouri Department of Mental Health, it receives Title XX Social Security block grant funds. For the 1987 fiscal year, Woodhaven School, Inc. received $247,204.467 in Title XX funds as of May 19, 1987. It received $72,710.91 in such funds in fiscal year 1986, $22,716.62 in 1985, and $46,256.47 in 1984. In addition to Title XX federal funds, Woodhaven School, Inc. stipulated that it has received other federal financial assistance from 1984 through 1987, including Title VI–C funds from the Missouri Department of Elementary and Secondary Education, federal funds from the Helen Keller National Center, and federal funds from the Bureau for the Blind. Plaintiff's Exhibit 1, Part II, ¶ 5. Woodhaven School, Inc. deposits the funds it receives in an operational checking account, and funds from that account are used to pay for the day-to-day expenses of the School. *Id.* ¶ 11.

Thus, the Court finds that both defendants are recipients of federal financial assistance as defined in § 504.

D. *Dennis Kohl is Otherwise Qualified for the Residential and Training Programs of Woodhaven Learning Center and Woodhaven School, Inc.*

■ Section 504 prohibits discrimination against handicapped individuals who are otherwise qualified for the program or benefits at issue. In *Southeastern Community College v. Davis*, 442 U.S. at 406, 99 S.Ct. at 2367, the Supreme Court defined an otherwise qualified person as "one who is able to meet all of a program's requirements in spite of his handicap." In the employment context, an otherwise qualified person is one who can perform the "essential functions" of the job in question. 45 C.F.R. § 84.3(k)(1) (1985). With regard to health, welfare and other social services, an otherwise qualified handicapped person is one who "meets the essential eligibility requirements for the receipt of such services." 45 C.F.R. § 84.3(k)(4). For the following reasons, the Court concludes that plaintiff has met and continues to meet the essential eligibility requirements for defendants' programs.

1. *Past Eligibility*

In 1983, the Missouri Department of Mental Health found Woodhaven Learning

Center, together with the day program at Woodhaven School, Inc., to be the most appropriate placement for plaintiff. DMH is obligated by state law to place its clients in the least restrictive environment. *See* Mo.Rev.Stat. § 633.115. At the time of this recommendation, plaintiff was residing in a community placement at Colonial Town. The department's community placement committee recommended referring plaintiff to Woodhaven Learning Center and Woodhaven School, Inc. because they had a deaf/blind program, and plaintiff, as a blind, mentally retarded individual, had particular needs which the Department's private vendors in the St. Louis area could not meet.

Woodhaven Learning Center itself also found that plaintiff met its essential eligibility requirements. The admissions materials which Woodhaven Learning Center received on plaintiff documented both his hepatitis B and his behavior problems. With that information before it, the Admission and Discharge Committee nevertheless concluded that plaintiff was appropriate for evaluation in the deaf/blind program in the Parmly Building.

After plaintiff had resided at Woodhaven Learning Center, the center continued to consider him appropriate for the deaf/blind program. At this 30–day evaluation, the Learning Center staff noted the progress he had already made in their program. Plaintiff was "well on his way to independent dressing" and had developed "the orientation and mobility skill of wall trailing ... more than current date indicates." The staff was also "confident that he has the capability to gain total independence in bathing with training." Plaintiff's Exhibit 17. The staff had observed some behavior problems, but had designed a behavior management program which they thought would reduce his maladaptive behavior by August of 1985. From the 30–day evaluation meeting, Nancy Shrewsbury, plaintiff's case manager, understood that the Woodhaven Learning Center staff felt that plaintiff was appropriate for their program.

That conclusion was borne out in the September 10, 1984 letter which James Mi-chael, the Assistant Executive Director of Woodhaven Learning Center, sent to Shrewsbury. In that letter, Michael informed her that the residential evaluation had been completed and plaintiff was found appropriate for the center's services. In fact, Michael stated that plaintiff "was determined to be appropriate for the residential as well as the vocational programs offered by Woodhaven Learning Center and the Occupational Resource Center." Plaintiff's Exhibit 18.

As Michael's letter indicates, Woodhaven School, Inc. also found plaintiff appropriate for their vocational program. Although "Dennis' lack of a formal educational or vocational program has resulted in a very severe deficit in the knowledge of, or skills required for a work setting," the School's certified vocational evaluator concluded that plaintiff's "willingness to all physical manipulation and his cooperation with the instructor ... makes him a good candidate for vocational intervention." Plaintiff's Exhibit 17. The evaluator also recommended a vocational training plan for plaintiff. That plan called for a "preshelter workshop/vocational skills development" program to equip him with the skills necessary to move on to "full-time employment in a sheltered workshop." Plaintiff's Exhibit 17. To implement the vocational program for plaintiff, the evaluator suggested a tutor/companion to speed up plaintiff's skill acquisition and a behavior intervention program to reduce his maladaptive behaviors. *Id.* The Executive Director of Woodhaven School concurred with this conclusion that plaintiff was a good candidate for vocational intervention, and he also believed that plaintiff would have benefitted from the vocational services offered at Woodhaven School, Inc.

Thus, at the time defendants refused to accept plaintiff for their programs, defendants admitted that he was appropriate for and could benefit from these same programs. They recognized that his hepatitis B was not the kind of handicap which would preclude him from reaping the benefits of the training that they could provide. Plaintiff's behavior problems *per se* did not render him inappropriate for their pro-

grams. On the contrary, defendants made him more appropriate for the behavior management training which both defendants provided and which they included in their habilitation and vocational plans for plaintiff.

### 2. *Present Eligibility*

Plaintiff still meets defendants' essential eligibility requirements. Despite defendants' contention that plaintiff no longer fits within the scope of their services and that the Court should not order prospective injunctive relief directing them to accept plaintiff, the evidence shows that their programs remain appropriate for his needs.

The Department of Mental Health continues to consider Woodhaven Learning Center and Woodhaven School, Inc. the appropriate placement for plaintiff. Plaintiff is on the Department's referral list for community placement, which means that he does not require the most restrictive environment of a state institution and his needs can be met by services in the community. However, plaintiff is not simply on the DMH community placement referral list; he is on the Department's specific referral list for Woodhaven Learning Center because of his blindness.

The fact that DMH still has plaintiff on its Woodhaven Learning Center referral list belies the center's contention that he no longer meets its eligibility requirements. While DMH and Woodhaven Learning Center agreed to some changes in the client population at the center, those changes have not affected plaintiff's eligibility.

Dr. Green also concluded that Woodhaven Learning Center could serve plaintiff appropriately within the scope of the staffing ratio required by state licensure. Specifically, Dr. Green testified that "the deaf-blind program at Woodhaven Learning Center would provide Dennis Kohl with residential services including daily living skill training and manage his behaviors within the limits of its one to four staff to client ratio." Transcript, Vol. 3, p. 55–56. Thus, this evidence shows that plaintiff meets the present eligibility requirements of Woodhaven Learning Center.

Plaintiff also continues to meet the essential eligibility requirements of Woodhaven School, Inc. The vocational training plan developed for plaintiff during his evaluation at the school called for "presheltered workshop/vocational skills development" with a behavior management program and a tutor/companion. Plaintiff's Exhibit 17. The school now provides developmental training, but it simply moved the clients from pre-sheltered workshop into developmental training because of the long waiting list for clients to progress from presheltered training into the sheltered workshop. Thus, plaintiff, like the other clients formerly in the presheltered workshop, would be appropriate for the school's developmental training. Indeed, the school's Executive Director admitted that the school "could provide services that are recommended" in plaintiff's vocational evaluation. Transcript, Vol. 2, p. 250. The school's description of services specifically provides that clients in developmental training "may display intermittent behavior problems." Plaintiff's Exhibit 31. Furthermore, the school's contract with DMH still includes behavior management as a service which the Department could purchase for its clients. Plaintiff's Exhibit 31. Although tutor/companion services are not in its present contract, Hassemer testified that an extension of that service might be possible. Dr. Green, however, saw "no real reason to have someone always one on one with Dennis Kohl." Transcript, Vol. 3, p. 92. In fact, Dr. Green testified that the Occupational Resource Center could "provide Dennis Kohl with the developmental or prevocational training and manage any behavior problems within the limits of its one-to-six staff-to-client ratio." Transcript, Vol. 3, p. 62. Thus, plaintiff still meets the eligibility requirements of Woodhaven School, Inc.

### 3. *Under the Analysis set forth by the Supreme Court in Arline, Plaintiff is Otherwise Qualified*

Although plaintiff meets the essential eligibility requirements of defendants' programs, the Court must determine whether

plaintiff is "otherwise qualified" under the standards pronounced by the United States Supreme Court in *School Board of Nassau County, Florida v. Arline,* —— U.S. ——, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). As the *Arline* court explained, the question of whether a handicapped person is "otherwise qualified" involves a two-step inquiry. In a case where the individual is handicapped by having a contagious disease, the first step is an individualized inquiry which should include:

"[findings of] facts, based on reasonable medical judgments, given the state of medical knowledge, about (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm." *Id.,* —— U.S. at ——, 107 S.Ct. at 1131.

Second, the trial court must determine, in light of these medical findings, if the accommodation necessary to eliminate any significant risk of communicating the disease is reasonable. In this case, the Court finds that the inoculation of "direct-contact staff"—those having direct, routine physical contact with plaintiff—would substantially reduce the risk of transmission, and that such accommodations would not require fundamental alteration of defendants' programs or impose any undue burden on them.

### a. *The nature of the risk (how the disease is transmitted)*

### (1) *What is hepatitis B?*

Hepatitis B is an inflammation of the liver due to infection with the hepatitis B virus. In most cases, the inflammation results in a flu-like illness so mild that it will not be brought to the attention of a physician. In acute, self-limiting hepatitis B, the symptoms may last days or weeks, but typically, the symptoms last for a few weeks. Some individuals develop more florid signs of the inflammation, experiencing jaundice of the skin, darkening of the urine, and feelings of fatigue.

There are approximately 200,000 reported cases of hepatitis B every year in the United States. The fatality rate for reported cases of the disease is less than 1%. Some 5–10% of the hepatitis B cases develop chronic infection or carrier status instead of having the self-limiting disease. A carrier is an individual who tests positive for surface antigen for longer than three to four months. Individuals who have an active case of hepatitis B infection and carriers who are chronically infected can transmit the disease to susceptible individuals.

There is no dispute here about whether plaintiff was and is a carrier of hepatitis B. From July of 1983 to his most recent test on May 8, 1987, he has tested positive for the surface antigen showing that he is a carrier.

### (2) *How is hepatitis B transmitted?*

There is a likelihood of exposure to hepatitis B when the body fluids of an infected person contact the body fluids of a susceptible person. In other words, the body fluids of an infected person must cross the intact skin or mucosal barrier of an individual who does not have immunity to hepatitis B before there is a possibility of contracting the hepatitis B virus. Almost all body fluids of an infected person contain infectious viral particles. However, not all body fluids have the same level of infectiousness. Blood is the most infectious body fluid. Saliva, on the other hand, has not been shown to be infectious without a trace contaminant of blood in the saliva. Thus, blood is 100 to 1000 times more infectious than saliva.

Hepatitis B illness or infection does not automatically result from body fluid-to-body fluid contact. A great number of individuals receiving a known exposure of the body fluid of an infected individual will not come down with the illness or infection. In fact, even where there is exposure to blood known to be surface antigen positive, there is only a 1–in–20 chance of getting the infection.

Hepatitis B is not transmitted by casual association or contact with a carrier. It is not transmitted through the air by a cough or sneeze. Infected blood or saliva on a

physical surface could present a likelihood of exposure to a susceptible individual whose broken skin came into contact with the surface. However, the mechanical action of rubbing and cleaning the surface with a solution of dilute clorox or household bleach will disinfect it and will take care of any residual virus.

The risk of plaintiff spreading the disease is heightened a great deal by plaintiff's maladaptive behavior, which includes biting, scratching and open masturbation. However, the Court finds, based on the testimony of Dr. Green and Madge Alter, a DMH psychologist, that most of plaintiff's behavioral problems have significantly diminished. When he observed plaintiff in May of 1987, Dr. Green stated that he saw no aggressive, self-abusive, or inappropriate sexual behaviors. The DMH staff with whom Dr. Green conferred indicated that they were having no problems with aggressive behavior from plaintiff. In Dr. Green's opinion, plaintiff's behavioral problems, particularly his self-injurious behaviors, have occurred when he was unoccupied and not involved in consistent, daily training on mobility, communication, bathing and other basic skills. According to Dr. Green, the best and most fundamental way to diminish plaintiff's maladaptive behaviors is to fill his hands and his time working on his favorable behaviors and to engage him in effective adaptive behavior programming. Indeed, the vocational and daily living skills training at the school and the center are precisely the kind of adaptive behavior programming which can substantially diminish or eliminate plaintiff's behavior problems.

b. *The duration of the risk (how long is the individual infectious)*

Carriers of hepatitis B may, but do not necessarily, remain carriers all of their lives. While many carriers may retain their infectiousness lifelong, about 1% of carriers spontaneously lose their carrier status each year, in which case all evidence of infection disappears and the infection is in permanent remission.

Furthermore, carriers of hepatitis B do not have the same level of infectivity. The difference in infectivity is shown by a blood test known as the e antigen test. The test measures the amount of complete viral particles produced by the carrier. Carriers produce both complete and incomplete viral particles, and it is the complete viral particles which transmit the infection. A carrier, then, who tests e antigen positive is producing large amounts of the infectious complete viral particle, while a carrier who is negative for the e antigen is making many more incomplete viral particles and small amounts of the complete particle. Thus, carriers who are e antigen negative are at a significantly lower level of infectivity and contagiousness than e positive carriers. In fact, given the same source and type of exposure, the e antigen negative carrier is 3 to 4 times less likely to infect a susceptible individual than the e positive carrier.

It is not unusual for a carrier to move from e antigen positive to e antigen negative since between 5 to 10% of all carriers per year will go from this higher level of infectivity to the lower e antigen negative level. In this case, plaintiff has gone from e antigen positive to e antigen negative. In tests administered between July, 1983 and November, 1985, plaintiff was e antigen positive. However, in September of 1986, plaintiff tested e antigen negative, and, again, in May of 1987, he was negative, showing that he is still at the lower level of infectivity.

c. *The severity of the risk (what is the potential harm to third parties)*

There is a highly effective, pre-exposure vaccine for hepatitis B. This pre-exposure vaccination provides active long-term immunity to hepatitis B. Inoculation with the vaccine, particularly when followed by a blood test to confirm the development of immunity, can eliminate virtually any potential harm to third parties resulting from the bite or scratch of a hepatitis B carrier.

Immunization with the vaccine is conferred in three doses. Three shots are given—one initially, another one month later, and a final shot six months later. The side effects or risks associated with the vaccine are minimal. Less than 5% of

those vaccinated will develop a low-grade fever or some irritation at the point of injection. There is no risk of picking up any other infectious agent, such as AIDS, from the vaccine.

Available commercially since the end of 1982, the vaccine is highly effective. In a general range of the population, it confers immunity at an 85–95% rate. Among young and middle-aged individuals, the vaccine is 95–99% effective. Very obese individuals, those who are immuno-compromised or have Down's Syndrome, and those over 50 develop immunity from the vaccine at a lower rate. The vaccine is so highly effective that post-inoculation testing to confirm the development of immunity from the vaccine is not generally recommended. However, where individuals have a greater risk of exposure to the virus, post-inoculation testing can be done to assure that the vaccine has provided them with a high level of protective antibody. Although it is not clear for how long the vaccination confers immunity, the Communicable Disease Center is expected to recommend a booster shot five years after the initial inoculation.

There is also a product available to protect an unimmunized individual who experiences a significant exposure to the hepatitis B virus. This product is known as hepatitis B immune globulin. Given within 48 hours after the exposure, hepatitis B immune globulin gives the unimmunized person a large amount of antibody to help his or her system fight the virus and develop short-term immunity to the disease. At the same time, the regular immunization process is also begun. While not as effective as the vaccine, hepatitis B immune globulin is a good and generally effective post-exposure prophylaxis.

These two products, the pre-exposure vaccine which is 85–95% effective and the post-exposure prophylactic which can be used in an emergency situation if an unimmunized person is exposed to the virus, provide a means for eliminating virtually any potential harm to third parties posed by plaintiff.

#### d. *The probability the disease will be transmitted and will cause varying degrees of harm*

The *Arline* decision requires an individualized inquiry into the risks presented by the particular handicapped individual with a contagious disease. In this analysis, the Court must differentiate between the risk plaintiff could potentially pose to other clients at the two facilities and the risk plaintiff poses to the staff in the two facilities.

##### (1) *Clients*

The evidence introduced at trial focused primarily on the probabilities of harm for unimmunized staff at Woodhaven School, Inc. and Woodhaven Learning Center. The focus on the staff was based primarily on the fact that nearly all of the clients in defendants' programs were or will be inoculated against hepatitis B.

At Woodhaven Learning Center, all of the clients have been or will be vaccinated against hepatitis B. The center participated in the screening and inoculation program that DMH implemented for its clients in private placements in 1985. The screening was done in February of 1985; at that time, 162 DMH clients and 43 private/other state residents were screened, and only 1 other carrier was identified. Presently, there is no identified carrier of hepatitis B among the residents of Woodhaven Learning Center.

The immunizations at Woodhaven Learning Center were begun in July, 1985, and completed in January, 1986. Since that immunization, Woodhaven Learning Center has admitted some new residents who were screened but not inoculated. As of April 10, 1987, 168 residents at the center had been inoculated and 16 had not. By the time of trial, however, the center had begun inoculation of the remaining 16 residents.

As of the same date, April 10, 1987, there were 61 clients who receive day programming at the Occupational Resource Center at Woodhaven School. Only three of those clients do not have immunity to hepatitis B either by inoculation or by having had the infection. The school has one client who is

an identified carrier of hepatitis B. According to Dr. Perrillo, the three unimmunized clients at the Occupational Resource Center should be immunized to protect them from contracting hepatitis B from plaintiff. Prior to the time that they have been inoculated, these unimmunized clients could work at a different table or in a different area of the ORC. That separation from plaintiff would minimize the possibility of him exposing them to the virus.

Both Dr. Donnell and Dr. Perrillo testified as to the availability and advisability of post-inoculation screening to confirm the development of immunity in those working directly with plaintiff. The same recommendations would seem appropriate for those clients living with or sharing a work-table with plaintiff.

Thus, it clearly appears that by inoculating the remaining unimmunized clients at Woodhaven School, Inc., any significant risk that plaintiff would pose to the clients in defendants' programs could be eliminated.

### (2) Staff

The *Arline* court instructed that, in making its individualized findings of fact, "courts normally should defer to the reasonable medical judgments of public health officials." *Arline,* —— U.S. at ——, 107 S.Ct. at 1131. The public health official who testified in this case was Dr. Donnell, Manager of the Section of Epidemiology Services, Missouri Department of Health. Dr. Donnell's section is responsible for communicable disease control, including the control of hepatitis B.

According to Dr. Donnell, the Missouri Department of Health generally recommends vaccination of staff in the programs and facilities for the mentally retarded; but how many staff should be vaccinated depends on such factors as whether there are carriers in the population, the number of carriers, and the likelihood of transmission. The Department of Health's recommendation is conditionally stated so that no institution would expect that their entire staff be immunized.

Dr. Donnell further testified that, in the individual circumstances presented by this case, "a barrier of protection" could be built around plaintiff. Since plaintiff would be the only identified carrier at Woodhaven Learning Center, and since the other residents have been or will be inoculated, the "barrier of protection" could be erected, in lieu of a complete inoculation of the entire staff, by immunizing the "direct contact staff"—those staff who would have continuous and direct contact with plaintiff—and by testing those staff after the vaccination to assure the vaccine has provided them with antibodies. The same recommendation would apply to the day training program at the Occupational Resource Center, i.e., to immunize the "direct contact" staff.

In Dr. Donnell's opinion, the barrier of protection around plaintiff could be preserved even in unforeseen emergency situations requiring staff intervention. He recommended that, in addition to immunizing the staff involved with plaintiff's routine care, the vaccine should be provided to those supervisors or other staff who would normally be used as backup in an emergency situation. Beyond having immunized "direct contact" staff and immunized back-up staff, management at the facilities could plan plaintiff's care so as to minimize the possibility of an emergency requiring the intervention of unimmunized staff. Such an emergency would, in Dr. Donnell's opinion, present such a brief kind of exposure that other staff would not need to be vaccinated. Post-exposure prophylaxis with hepatitis B immune globulin could be used to provide protection in an emergency of that nature.

Dr. Robert Perrillo stated that there are two main reasons that Woodhaven Learning Center and Woodhaven School, Inc. would not need to inoculate all of their staff in order to provide plaintiff with services in a safe manner.

First, as demonstrated by recent screenings, defendants have an exceptionally low prevalence of carriers among their client population. In fact, plaintiff would be the only carrier at Woodhaven Learning Center and one of two carriers at the Occupational Resource Center. Second, the physical lay-

out of defendants' programs are such that most unimmunized staff would not need to have direct physical contact with plaintiff.

According to Dr. Perrillo, Woodhaven Learning Center could have eliminated any significant risk that plaintiff would transmit hepatitis B to its unimmunized staff by inoculating and screening those staff who would have routine hands-on contact with plaintiff. According to Dr. Perrillo, the Center should have taken a "head count" of the staff who would have "actual physical direct contact with Dennis" including "not only individuals involved with his daily care" but also those who "might substitute ... during periods of vacation." Transcript, Vol. 1, p. 149. Specifically, Dr. Perrillo recommended that the Center should have inoculated the life skills instructors who would provide plaintiff with care and training, the supervisory staff in his building whose jobs would involve hands-on care or training for plaintiff, the LPN assigned to his wing of the building, and the doctor and nurse providing patient care at the center.

By immunizing staff having physical contact with plaintiff, the risk he would present to the other staff would be so remote that they would not require inoculation. The janitorial and housekeeping staff assigned to his building could greatly minimize their risk by wearing gloves when handling his sheets, waste materials, and appliances. Plaintiff's laundry could be bagged and marked, so that laundry workers would know to wear gloves when handling his linens and clothes. His laundry would not require separate cleaning since hot water and detergent kill the virus. Plaintiff's toilet articles could be marked and placed in a safe receptacle. In Dr. Perrillo's medical opinion, other staff such as groundskeepers, LPNs assigned to other buildings, direct care staff working with clients in other buildings, would not need to be immunized. However, those staff should receive in-house training about the presence of a carrier, the means of transmission, and the need to use inoculated staff to handle emergencies.

According to Dr. Perrillo, the Occupational Resource Center of Woodhaven School could also have eliminated any significant risk that plaintiff would transmit hepatitis B to its unimmunized staff. The safety of unimmunized staff could have been insured by inoculating those staff who would have direct physical contact with plaintiff.

Specifically, Dr. Perrillo observed that the vocational instructors and aides who actually worked with plaintiff to implement his program would need to be inoculated. It would also be reasonable to inoculate the monitors on the bus plaintiff would ride from Woodhaven Learning Center to the school. By surrounding plaintiff with these inoculated employees, others, such as administrative staff, instructors and aides working in other parts of the resource center, and therapists who did not provide services to plaintiff, would not need inoculation. Certainly, the staff at the special education program operated by Woodhaven School, Inc. in a different building in a different part of town would not need to be immunized because of the low risk presented by plaintiff's attendance at the Occupational Resource Center.

Like Dr. Donnell, Dr. Perrillo thought that the barrier of protection surrounding plaintiff could be reinforced by post-inoculation screening of those staff providing hands-on care and training for plaintiff. The post-inoculation screening would show any individuals who had not developed immunity and who should, therefore, be encouraged to work in buildings other than the Parmly or other areas of the Parmly Building. Dr. Perrillo testified that if individuals had received the 3-dose inoculation, and screening then confirmed their immunity, then these individuals would not get hepatitis B even if they were scratched or bitten by a carrier. The only qualification to this almost total protection provided by screening-confirmed immunization is if an individual only developed a low level of antibody and then received a large dose of the virus. Since the screening would also reveal those individuals with minimal antibody levels, they too could be encouraged to work in areas away from plaintiff.

By inoculating and confirming immunity in those staff who would need to have routine hands-on contact with plaintiff, defendants could have eliminated and still can eliminate any significant risk of his transmitting hepatitis B to the immunized or unimmunized staff.

Since plaintiff is and would have been the only identified carrier at Woodhaven Learning Center and one of only two carriers at the Occupational Resource Center, the immunized hands-on staff would provide a barrier of protection between plaintiff and the unimmunized staff. The efficacy of that immunity barrier was and is heightened by the physical layout of defendants' programs, meaning that other unimmunized staff have little, if any, physical contact with plaintiff. Additionally, protection can and could have been provided by in-house training and management practices designed to ensure that any exposure-threatening emergency involving plaintiff would be handled by immunized staff. Finally, hepatitis B immune globulin is and has been available to provide effective post-exposure protection in the unlikely event that an unimmunized employee were the only person available to give CPR, first aid, or other assistance to plaintiff.

(3) *Inoculating and Screening the "Direct Contact" Staff Designed to Work With Plaintiff is a Reasonable Accommodation of His Handicap*

The individualized medical findings in this case show that defendants can eliminate any significant risk of plaintiff transmitting hepatitis B by inoculating and screening the staff designed to work directly with him. If that accommodation is a reasonable one under the established standards, then plaintiff is an "otherwise qualified" handicapped individual under Section 504.

In *Arline*, the Supreme Court summarized the standard for reasonable accommodation. "Accommodation is not reasonable if it either imposes 'undue financial and administrative burdens on a grantee' ... or requires 'a fundamental alteration in the nature [the] program.'" *Arline*, ⸺ U.S. at ⸺, n. 17, 107 S.Ct. at 1131, n. 17, *quoting Southeastern Community College v. Davis*, 442 U.S. at 410, 412, 99 S.Ct. at 2369, 2370.

Accommodating plaintiff clearly would not require a fundamental alteration in the nature of defendants' programs, and, plaintiff can obviously "realize and enjoy" the benefits of defendants' residential and training programs in spite of his handicap. Plaintiff's hepatitis B, in and of itself, does not impair his ability to realize the benefits of training and from acquiring mobile skills, daily living or vocational skills. In fact, defendants themselves found plaintiff to be appropriate for their programs. Plaintiff's status as an active carrier of hepatitis B simply requires accommodation to eliminate any significant risks that he poses to others; this status does not affect plaintiff's ability to benefit from defendants' programs, and thus accommodating him would not involve a fundamental alteration of those programs.

Inoculating and screening the staff designated to work with plaintiff also would not impose any undue financial or administrative burden on defendants. In *Nelson v. Thornburgh*, 567 F.Supp. 369 (E.D.Pa. 1983), *aff'd*, 732 F.2d 146 (3rd Cir.1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 955, 83 L.Ed.2d 962 (1985), the District Court required the Pennsylvania Department of Public Welfare to hire readers or provide the mechanical equivalents of readers in order to accommodate blind income maintenance workers. *Id.* at 382. In so holding, the court noted that "[c]ases interpreting section 504 have uniformly recognized that preventing discrimination against the handicapped may mean that recipients of federal funds will have to expend funds of their own." *Id.* at 381.

In this case, the two costs involved here are inoculation and screening. The evidence on the per person cost of inoculation showed a range from about $100 in 1985 to about $150–175 now. The cost of post-inoculation screening is approximately $20 to $25.

For Woodhaven Learning Center, the cost of accommodating plaintiff is and would have been minimal. According to

Dr. Perrillo, the center could have eliminated any significant risk of plaintiff transmitting hepatitis B by inoculating and screening the direct care or life skill instructors working directly with plaintiff, some other instructors to fill in during absences or vacations, the LPN assigned to his wing of the building, the supervisory staff in his building, and the nurse and the doctor on the staff. According to James Michael, the Assistant Executive Director of the Center, there are 5 supervisory staff in the Parmly Building; in the past, there were six.

Mr. Michael also prepared a one-week staffing pattern for the west wing of the Parmly Building. *See* Plaintiff's Exhibit 26. Although that pattern reflects an ideal 1:3 staff-to-client ratio rather than the 1:4 ratio required by state licensing rules, it shows that 19 people would be required to provide direct care to plaintiff on a wing of the building in which plaintiff would be placed. In 1985, it would have cost approximately $2375 to inoculate and screen those 19 direct care staff in the Parmly west wing; it would cost approximately $3800 now. In addition, it would have cost approximately $1125 in 1985 to inoculate the supervisory staff, LPN nurse and doctor; the cost would be $1600 now. Mr. Michael's diagram also notes that hours for vacation and sick leave replacement is calculated by using a factor of .1 or 5.7 hours per week for the Parmly west wing. Plaintiff's Exhibit 26. Although the diagram does not indicate how many staff would be used to provide that additional 5.7 hours of replacement time per week, it does not seem unreasonable that two to three other staff at a cost of $375 to $600 could be inoculated and screened to serve as the designated replacements for any absences or vacations in the Parmly wing where plaintiff would live. Finally, if the 16 to 20 clients living with plaintiff were screened to make sure that they were immune, such screening would cost $400 to $500.

In summary, it would have cost Woodhaven Learning Center approximately $4600 in 1985 to accommodate plaintiff and approximately $6500 now. Since the Woodhaven Learning Center has its own medical staff, the overhead costs of administering the shots and blood tests would be minimal. Furthermore, costs might even be reduced by purchasing the serum in bulk. The staff turnover experienced by Woodhaven Learning Center would appear to require additional inoculation and screening in the future. In 1986, Michael indicated that the Center had hired 226 new employees out of a total of 300—a turnover rate of approximately 75%. Assuming that same turnover rate would apply in the future to staff in the Parmly west wing, approximately 22 employees per year would need to be inoculated and screened at a cost of $4400.

These costs to accommodate plaintiff would not have imposed and will not impose an undue financial burden on Woodhaven Learning Center. Expenditures of $4600 in 1985, $6500 now, and perhaps $4400 per year in the future, are a minute fraction of Woodhaven Learning Center's $4 million per year budget.

For Woodhaven School, Inc., the costs for accommodating plaintiff would be equally modest. At the time the School excluded plaintiff from its program, Hassemer had indicated that 3 to 4 people would have been designated to work directly with plaintiff. According to Nancy Shrewsbury, that figure included a person to fill in for absences and vacations. Therefore, it would have cost Woodhaven School, Inc. approximately $500 in 1985 to inoculate and screen the "direct contact" staff who would work directly with plaintiff.

Dr. Perrillo testified that Woodhaven School, Inc. would need to inoculate and screen only those vocational instructors and aides working directly with plaintiff. Also, a person to fill in for absences and vacations would also need to be inoculated and screened. When Dr. Green toured the Occupational Resources Center, he observed four staff members providing services in the work activities center where plaintiff would probably start his training. Inoculating and screening those four employees would now cost the school approximately $1000. Dr. Perrillo also suggested that the bus monitor(s) riding with plaintiff to the ORC should also be inoculated and

screened. If the monitor(s) were employees other than the vocational aides, some additional staff might require inoculation and screening. There were also three un-immunized clients at the ORC. If their respective funding or referring agencies were not willing to pay for their inoculation, there could be an additional cost of $525 to $600 for the school. Finally, Hassemer testified that Woodhaven School, Inc. experienced an annual turnover of 50% among its vocational aides. Assuming that rate remained constant, the school would need to inoculate and screen 2 or 3 new aides per year at a cost of $400 to $600, to work directly with plaintiff or to be available for back-up.

The costs to accommodate plaintiff would have imposed and will impose no undue financial burden on Woodhaven School. Expenditures of $500 in 1985, approximately $1600 now, and perhaps $400 to $600 per year in the future are not a significant financial burden in light of the school's $1.1 million annual operating budget.

Thus, the Court concludes that plaintiff is an "otherwise qualified" handicapped individual within the meaning of Section 504 of the Rehabilitation Act. Defendants could have eliminated any significant risk and accommodated plaintiff's handicap by inoculating and screening those staff designed to work and have routine hands-on contact with plaintiff. Inoculating and screening those limited numbers of "direct contact" staff and backup staff would have imposed no undue financial burden on defendants and, therefore, would have been a reasonable accommodation.[2]

### E. *Attorney's Fees Under Section 794a*

■ Section 794a(b) provides that "[i]n any action or proceeding to enforce or charge a violation of a provision of this subchapter, the court, *in its discretion, may allow* the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 29 U.S.C. § 794a(b) (emphasis added). In light of the fact that the Court's remedy in this case will require defendants to expend a considerable amount of money in order to accommodate plaintiff, then the Court, in its discretion, declines to award plaintiff attorney's fees pursuant to Section 794a(b).

### Conclusion

In accordance with the foregoing opinion, it is hereby ORDERED that the Court finds that defendants Woodhaven Learning Center's and Woodhaven School, Inc.'s policy and practice of excluding plaintiff from and denying plaintiff the benefits of their residential and day-training programs violate plaintiff's rights under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. It is further

ORDERED that defendants be permanently enjoined from excluding plaintiff from and denying him the benefits of their residential and day-training programs. It is further

ORDERED that defendants submit to the Court within thirty (30) days from the date of this order a proposed plan for the inoculation and screening of staff and un-immunized clients in accordance with this opinion. This plan must be formulated and

---

**2.** This conclusion is further supported by the fact that institutions for the mentally retarded have a higher degree of the disease of hepatitis B and present the greatest opportunity for the disease to be transmitted. Recognizing this fact, the Missouri Department of Mental Health sought and received an emergency appropriation of $1.2 million from the Missouri Legislature to cover the expenses of the screening and inoculation of DMH employees and clients. While defendants have sought and been refused public funding for its inoculation program, it appears, based on the fact that institutionalized mentally retarded individuals fall within the "high-risk" group of potential carriers of hepatitis B, that the costs associated with the develop-

ment of an inoculation and screening program represent a "cost of doing business" for private institutions, like that of defendants, which cater to the mentally retarded. If mentally retarded individuals like Dennis Kohl were deprived of the benefits of residential placement and vocational training in private institutions merely because of their status as hepatitis B carriers, then the whole Congressional purpose of the Rehabilitation Act—to develop and implement, through research, training, services, and the *guarantee of equal opportunity,* comprehensive and coordinated programs of vocational rehabilitation and independent living for the mentally retarded—would be thwarted.

implemented expeditiously so that plaintiff may be immediately admitted upon completion of the inoculation and screening of the persons specified in this order. It is further

ORDERED that plaintiff will have twenty (20) days from the date that defendants file their proposed plan in which to file objections to defendants' plans. It is further

ORDERED that each party shall bear their own costs.

Donald GIESEKING, Jeffrey Snatilli, Mark Miget, Joseph Nowotny, Cecil Hancock, Darlene Declue, Missouri Protection & Advocacy Services, Plaintiffs,

v.

Keith SCHAFER, Gary V. Sluyter, Otis R. Bowen, Secretary of Health & Human Services, John Ashcroft, Governor, State of Missouri, Defendants.

No. 86–4636–CV–C–5.

United States District Court, W.D. Missouri, C.D.

Aug. 13, 1987.

Ann B. Lever, Roger J. Bertling, St. Louis, for plaintiffs.

Mary Stewart Tansey, Joann Leykam, Jefferson City, Mo., for State defendants.

Christy Schmidt, Office of Gen. Counsel, Dept. of Health & Human Services, Kansas City, Mo., for Federal defendant.

## ORDER

SCOTT O. WRIGHT, Chief Judge.

Before the Court are the Federal and State defendants' motion to dismiss or, in the alternative, for summary judgment as to all counts of plaintiffs' first amended complaint. For the following reasons, the Court concludes that plaintiffs' claims under the Rehabilitation Act and the due process clause must be dismissed. However, defendants' motion to dismiss as to the remaining claims must be denied.

### Factual Background

Plaintiffs bring this action individually and on behalf of other similarly situated individuals pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure. Plaintiffs seek certification of a

class which consists of all handicapped persons within the State of Missouri who have been or will be determined by the Missouri Department of Mental Health ("DMH") or one of its regional centers to be developmentally disabled and for whom DMH and its regional centers have failed or will fail to develop individual habilitation/treatment plans or to secure treatment, training, placement, residential care, habilitation or other services consistent with their individual habilitation/treatment plans and comprehensive service needs. The proposed plaintiff class also includes a sub-class of developmentally disabled persons who have been or will be committed to institutions operated by DMH and for whom DMH and its regional centers have failed or will fail to secure the community group living arrangements called for by their individual habilitation/treatment plans.

Plaintiffs bring this action against the State defendants pursuant to 42 U.S.C. § 1983, alleging that the State defendants' failure to develop and implement individual habilitation plans for developmentally disabled individuals and the failure to meet their comprehensive service needs violate the Developmental Disabilities Act of 1984, 42 U.S.C. § 6000 *et seq.* (Supp.1987) ("DD Act"). The DD Act is a federal-state grant program whereby the federal government provides financial assistance to participating states to assist in creating programs to care for and treat the developmentally disabled. Additionally, plaintiffs allege that implementing individual habilitation plans and providing comprehensive services to some developmentally disabled individuals while denying them to plaintiffs and the class they seek to represent also violates section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Plaintiffs further allege that the Secretary of Health and Human Services has failed to perform his statutory duties to ensure compliance with the DD Act and section 504 of the Rehabilitation Act. Finally, plaintiffs contend that allowing plaintiff Donald Gieseking and his putative sub-class to remain institutionalized despite professional recommendations for community placement violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution. Plaintiffs seek both declaratory and injunctive relief and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and 29 U.S.C. § 794a.

Both the Federal defendant and the State defendants have moved to dismiss or, in the alternative, for summary judgment. The Federal defendant has moved to dismiss on the following grounds:

(1) The State program referred to in plaintiffs' complaint does not receive federal funds and, thus, is not a program assisted by DD Act funds; (2) the DD Act does not create an implied right of action against the Secretary of the Department of Health and Human Services; and (3) no private cause of action exists against the Secretary under § 504 of the Rehabilitation Act.

The State defendants have moved to dismiss on the following grounds:

(1) The DD Act does not allow a private cause of action against state officials, nor does it create substantive rights to an individual habilitation/treatment plan or services; (2) plaintiffs' Rehabilitation Act claim should be dismissed because the exclusive remedy for claimed inappropriate use of DD funds is the DD Act; and (3) plaintiffs' Constitutional claims should be dismissed because there is no Constitutional right to an individual habilitation/treatment plan or to community placement.

**Program Assisted With DD Act Funds**

The initial question before the Court is whether plaintiffs have properly alleged that the state program alleged in plaintiffs' complaint is a program assisted with DD Act funds. As noted by the Federal defendant, if the program does not receive federal funds under the DD Act, then the state is under no obligation to assure the Secretary that each person found to be developmentally disabled has a habilitation plan or receives appropriate services. *See Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 28, 101 S.Ct. 1531,

1545, 67 L.Ed.2d 694 (1981) ("Pennhurst I").

Section 123(a) of the DD Act provides that:

"The Secretary shall require as a condition to a State's receiving an allotment under this subchapter that the State provide the Secretary satisfactory assurances that each program (*including programs of any agency,* facility, or project) *which receives funds from the State's allotment* under this subchapter (1) has in effect for each developmentally disabled person who receives services from or under the program a habilitation plan meeting the requirements of subsection (b) of this section, and (2) provides for an annual review, in accordance with subsection (c) of this section of each such plan." (emphasis added)

Section 6022(b)(5)(C), in reference to the requirements of state plan approval, provides that:

"The plan must contain or be supported by assurances satisfactory to the Secretary that the human rights of all persons with developmental disabilities (especially those persons without familial protection) who are receiving treatment, services or habilitation under *programs assisted* under this part will be protected consistent with section 6009 of this title (relating to rights of the developmentally disabled)." (emphasis added)

The Federal defendant asserts that because plaintiffs did not receive services under a program assisted by DD Act funds, then plaintiffs have failed to state a claim under the DD Act upon which relief may be granted. Plaintiffs counter by arguing that plaintiffs do indeed receive habilitation services under a program assisted by DD Act funds, and that the assisted program under which they receive services is the Missouri Division of Mental Retardation and Developmental Disabilities' service delivery program, comprised of the regional centers for the developmentally disabled and the regional advisory councils on developmental disabilities. In order to answer the question of whether the program alleged in plaintiffs' complaint is a "program assisted" with DD Act funds, the Court must first analyze the Missouri scheme for the administration of services to developmentally disabled individuals.

The Missouri Department of Mental Health ("DMH") is the state agency designated to administer or supervise administration of the state plan submitted for Missouri's allotment of DD Act funds. *See* 42 U.S.C. § 6022(b)(1)(B). The Division of Mental Retardation and Developmental Disabilities is the actual grantee of Missouri's DD Act funds; it makes the application for those funds and has final decision-making authority on sub-grants of those funds. The Division of Mental Retardation and Developmental Disabilities ("Division") is, by state law, charged with the responsibility of providing services to mentally retarded and developmentally disabled clients of the DMH. Mo.Rev.Stat. § 633.010.2(1).

The Division has a service delivery system to link developmentally disabled clients with the services that they need. To ensure the accessibility of services for the developmentally disabled, the DMH has divided the state into eleven (11) regions. Mo.Rev.Stat. § 633.035. Each region has a regional council on developmental disabilities and a regional center for the developmentally disabled. *See* Mo.Rev.Stat. § 633.040, 633.100. As noted by plaintiffs, the regional councils and regional centers are the principal vehicles for the Division's service delivery system.

The regional centers are the entry or primary access points for developmentally disabled individuals into the Division's service delivery system. The regional centers evaluate whether applicants meet the developmental disability eligibility criteria. Once eligibility is determined, the client is assigned to a regional center case manager who is responsible for organizing the individual habilitation planning process for the client. Through the individual habilitation planning process, the client's service needs and least restrictive environment are identified. The case manager then links the client with appropriate services for his or her individual needs. Once the client's service needs are identified, the Division

meets those needs in two ways: (1) directly through its own facilities; or (2) by contracts with community-based providers. Regardless of whether a client's services are provided directly by the Division or are purchased from community vendors with funds allocated to each regional center, it is the regional center which coordinates those services for the individual client.

The regional councils are the other integral part of the service delivery system. It is through the regional councils that the Division's service delivery system receives DD Act funds. In fiscal year 1987, as well as in previous years, the Division is using federal DD Act monies to fund staffing grants for all eleven regional councils. Specifically, $394,805.66 in DD Act funds paid part of the salaries of the eleven regional council coordinators and secretaries as well as the operating expenses of the councils. The regional coordinators and secretaries are the permanent, day-to-day staff of the regional councils.

Under the DD Act, the state plan for fiscal year 1987 must identify three out of four "priority services" in which at least 65% of its allotment will be spent. *See* 42 U.S.C. §§ 6022(b)(4)(B)(i)(II), 6022(b)(4)(E), and 6001(11)(C). These four "priority services" are "alternative community living arrangement services, employment-related activities, child development services, and *case management services.*" (emphasis added) 6001(11)(C). The Division chose case management, child development and employment related activities as its three priorities. Under the DD Act, "case management services" are defined as:

"... such services to persons with developmental disabilities as will *assist them* in gaining access to needed social, medical, educational and other services. Such term includes—

(i) follow-along services to ensure, through a continuing relationship, lifelong if necessary, *between an agency or provider* and a person with a developmental disability and the person's immediate relatives or guardians that the changing needs of the person and the

family are recognized and appropriately met, and

(ii) *coordination services* which provide to persons with developmental disabilities support, access to (and coordination of) other services, information on programs and services, and monitoring of the person's progress." (emphasis added).

The staffing grants for the regional councils are funded as "case management services."

As part of the case management services which they provide with federal DD Act funds, the regional councils, in conjunction with the regional centers, prepare annual plans for the regions. Those plans include: (1) an inventory of existing residential facilities, day programs and specialized services for the mentally retarded and developmentally disabled; (2) an assessment of needs, including any special target populations, of unserved or underserved, or inappropriately serviced persons; and (3) a statement of specific goals for the region. *See* Mo.Rev. Stat. § 633.045.1. The specific service goals and priorities for services established in the regional plans are used by the regional centers to request funding for expanded services in their areas.

In addition to shaping the budget for services to regional center clients, the regional councils provide client-directed services in other ways. The regional councils must "review and advise on programs and policies of the regional centers." Mo.Rev. Stat. § 633.051. They may also consider the appropriate use of existing agencies and personnel providing residential, day programming or other specialized services and advise the regional centers on methods of operation to assure comprehensive services for the developmentally disabled in their region. *See* Mo.Rev.Stat. § 633.050.2.

Plaintiffs argue that because of the mutually dependent roles of the regional centers and regional councils in case management, budget planning, policy development, service prioritizing, and service expansion, DD Act funding for the regional councils constitute DD Act assistance to the Division of Mental Retardation and Develop-

mental Disabilities' service delivery program. In support of this contention, plaintiffs note that they receive services under this service delivery program and have received evaluation and diagnostic services from the regional centers. Plaintiffs further state that it is through the regional centers that they also receive such services as case management, counseling and vocational training. Thus, plaintiffs argue that since it is the service delivery program of the Division which has failed to develop and implement individual habilitation plans for plaintiffs and which has failed to secure for plaintiffs the other services appropriate to their needs, and since that program receives DD Act assistance in the form of staffing and operating grants for the regional councils, then the Division's service delivery program is a program assisted by DD Act funds.

The Federal defendant counters by quoting from relevant portions of the DD Act legislative history, noting that Congress requires habilitation plans "only when the Federal assistance under this Act contributes a portion of the cost of the habilitation services to the developmentally disabled persons." H. Conf.Rep. No. 94–473, 1975 U.S. Code Cong. Admin.News 919, 963. The Federal defendant states that the role of the regional councils is to advise and review policies and programs, not to provide direct services. In addition, the Secretary argues that the funds budgeted to the regional councils for case management are for salaries, fringe benefits, staff travel, office and communication expenses, and planning; thus, funding to the regional councils does not provide any portion of the cost of habilitation services.

The Court finds the Federal defendant's argument that no DD Act funds are used for habilitation services unpersuasive. As noted by plaintiffs, through case management, the Division's service delivery program links developmentally disabled individuals with the habilitation services appropriate to their needs. Those case manage-

ment services are provided by both the regional centers and the regional councils. Additionally, federal DD Act funds pay part of the salaries of the eleven regional coordinators (some of whom are regional council members) and secretaries, as well as the operating expenses of the councils. Additionally, under Missouri's DD Act grant, the regional councils are funded as "case management services"—services to developmentally disabled individuals that will assist them in gaining access to needed social, medical, educational, and *other services*—rather than as administrative activities. *See* 42 U.S.C. § 6001(11)(H). Furthermore, as noted by plaintiffs, the state defendants' own officials testified, by way of deposition, that the regional councils provide case management services through their coordination activities, insuring that services are provided to developmentally disabled individuals, and by providing advice for and review of the service delivery functions carried out by the regional centers. *See* Conklin Dep. p. 36, lines 23–25; Conboy Dep. p. 25, lines 11–19.

■ Therefore, the Court concludes that since federal DD Act funds support, at least indirectly, the Division of Mental Retardation and Developmental Disabilities' service delivery program—which is administered by the regional center and the regional council through case management— and since that program provides coordination services which provide developmentally disabled individuals support and access to other services (including habilitation services), then the program is one assisted by DD Act funds.

### Private Right of Action Under the Developmental Disabilities Act

The next question for the Court is whether plaintiffs have a private cause of action under § 122(b)(5)(B) and § 123 of the Developmental Disabilities Act of 1984, 42 U.S.C. § 6000 *et seq,* ("DD Act") or a cause of action under 42 U.S.C. § 1983.[1]  How-

---

ever, before undertaking this monumental task, the Court must first take a brief look at the general structure and analyze the overall purposes of the Act.

To begin with, the DD Act itself establishes a federal-state grant program whereby the Federal Government provides financial assistance to participating states to assist them in creating programs to care for and treat the developmentally disabled. As with other federal-state cooperative programs, the Act is voluntary, and states are given the choice of complying with the conditions set forth in the Act or foregoing the benefits of federal funding. *See Pennhurst I,* 451 U.S. at 13, 101 S.Ct. at 1537.

The Act begins with a list of Congressional findings and an exhaustive statement of purposes. 42 U.S.C. § 6000(a) and (b). The "overall purpose" of the Act is:

"... to assist States to (A) assure that persons with developmental disabilities receive the care, treatment, and other services necessary to enable them to achieve their maximum potential through increased independence, productivity, and integration into the community, and (B) establish and operate a system which coordinates, monitors, plans, and evaluates services which ensures the protection of the legal and human rights of persons with developmental disabilities." 42 U.S.C. § 6000(b)

Section 121, as a preface to Subchapter II of the Act, provides that

"[t]he purpose of this subchapter is to provide payments to States to plan for, and to conduct, activities which will increase and support the independence, productivity, and integration into the community of persons with developmental disabilities."

The Act also lists a variety of conditions for the receipt of federal funds. Under § 109, for example, the Secretary, "[a]s a condition of providing assistance" shall require that "each recipient of such assistance take affirmative action to employ and advance in employment qualified handicapped individuals ..." Another condition

action at law, suit in equity, or other proper

to receipt of funds under the Act is the submission of a state plan which must be approved by the Secretary. § 6022(a). Section 6022(b)(5) provides that "[t]he plan must provide that services are provided in an individualized manner consistent with the requirements of section 6023 of this title (relating to habilitation plans)." A further condition, which is the crux of plaintiffs' claim under the DD Act, is that "[t]he Secretary shall require as a condition to a State's receiving an allotment under this subchapter that the State provide the Secretary satisfactory assurances that each program (including programs of any agency, facility, or project) which receives funds from the State's allotment under this subchapter (1) has in effect for each developmentally disabled person who receives services from or under the program a habilitation plan...." § 6023(a). Finally, a further condition is that "the State must have in effect a system to protect and advocate the rights of persons with developmental disabilities...." § 6042.

The Act also provides procedures and sanctions to ensure state compliance with its requirements. First, the Secretary may disapprove a state plan. § 6022(b). If a State fails to comply with the requirements of § 6022 (requirements for a state plan), the Secretary "*shall* make no further payments to the State ... or shall limit further payment ... to activities in which there is no such failure." § 6027. Any state that is dissatisfied with the Secretary's disapproval of a plan, or with his decision to terminate or limit funding, may appeal to the federal courts of appeals. § 6029. No other cause of action is expressly recognized in the Act.

The thrust of plaintiffs' argument is that the development and implementation of individual habilitation plans is a condition to the receipt of DD Act funds for the State of Missouri, and that plaintiffs have a substantive right to enforce Missouri's obligation either by way of a private cause of action under § 122(b)(5)(B) and § 123 of the DD Act, or by bringing an action under 42 U.S.C. § 1983 to enforce these provisions.

proceeding for redress."