865 F.2d 930
 51 Ed. Law Rep. 383
 Dennis KOHL, by his parents and guardians, Norbert and Jean
KOHL, Appellees,
v.
WOODHAVEN LEARNING CENTER, a corporation, and Woodhaven
School, Inc., a corporation, Appellants.
 Nos. 87-2627, 87-2644.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 14, 1988.
Decided Jan. 10, 1989.
Rehearing and Rehearing En Banc Denied May 12, 1989.
 
 Marvin E. Wright, Columbia, Mo., for appellants.
 Ann B. Lever, St. Louis, Mo., for appellees.
 Before McMILLIAN, WOLLMAN and BEAM, Circuit Judges.
 WOLLMAN, Circuit Judge.
 
 
 1
 The Woodhaven Learning Center and Woodhaven School, Inc. (WLC and WS, or collectively Woodhaven) appeal from the district court's[1] order granting Dennis Kohl declaratory and injunctive relief. See Kohl v. Woodhaven Learning Center, 672 F.Supp. 1226 (W.D.Mo.1987). The district court found that Woodhaven had discriminated against Kohl, an active carrier of infectious hepatitis B, and in doing so violated his rights under section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. Sec. 794 (1986) (the Act). Id. at 1248. The district court permanently enjoined both institutions from denying Kohl admission and ordered each to submit to the court a proposed plan for inoculating certain of their staff against hepatitis B. Id. at 1248-49. We reverse the district court's order granting Kohl injunctive and declaratory relief and remand for further proceedings.
 
 I.
 
 2
 WLC and WS, located in Columbia, Missouri, are not-for-profit corporations organized and existing under the laws of the State of Missouri. Both receive federal funding through various programs. WLC provides residential placement for handicapped individuals and is also a "life-skills facility" that seeks to enable its clients to function more independently. WS is a habilitation facility that provides educational, pre-vocational, and vocational day programs for handicapped individuals. At the time of the trial, WLC had approximately 180 clients and 300 employees; WS had approximately 55-60 employees and 60 clients. Both institutions have a high staff turnover rate.
 
 
 3
 Kohl is thirty-two years old, mentally retarded, bilaterally blind, and an active carrier of hepatitis B. As a result of his physical and mental impairments, he frequently exhibits maladaptive behavior, including scratching, biting, open masturbation, and self-abuse.
 
 
 4
 In 1983, the Community Placement Committee of the Missouri Department of Mental Health (DMH) recommended referring Kohl to Woodhaven from Colonial Town, a private hospital where Kohl was then residing and where he had been placed by the DMH. Kohl's parents, along with his DMH case manager, completed his application to Woodhaven in early 1984. Kohl is an adjudicated incompetent, and his parents are also his legal guardians. In July of 1984, Kohl was admitted to Woodhaven for evaluation.
 
 
 5
 On September 10, 1984, WLC informed Kohl's DMH case manager by letter that Kohl was "determined to be appropriate" for WLC's program, but that he was being refused admission because WLC would not accept a hepatitis B carrier until all its clients and staff were inoculated and screened. Similarly, although a certified vocational evaluator from WS rated Kohl as a "good candidate" for its programs, Kohl was denied admission to WS. Kohl was discharged from the Woodhaven program on October 26, 1984. WLC informed Kohl's parents twice during the first half of 1985 that Kohl could return when immunization was complete.
 
 
 6
 Kohl's parents filed this action in his behalf on April 14, 1986, seeking, inter alia, an injunction prohibiting WLC and WS from excluding Kohl.
 
 
 7
 The district court found that WLC and WS had violated Kohl's rights under section 504 of the Rehabilitation Act, which provides:
 
 
 8
 No otherwise qualified individual with handicaps * * * shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance * * *.
 
 
 9
 29 U.S.C. Sec. 794 (1988). The district court found that Kohl was an otherwise qualified handicapped individual within the meaning of the Act and that WLC and WS had discriminated against him solely on the basis of his handicap. On the basis of the testimony of Kohl's medical experts, the district court found that WLC and WS could reasonably accommodate Kohl without either significant alteration in their programs or undue cost by inoculating and screening only the small percentage of their staffs that would regularly come into direct contact with Kohl.
 
 II.
 
 10
 Hepatitis is an infection that primarily affects the liver and is often caused by specific viruses, one of which is the hepatitis "B" virus.[2] The most common symptoms of hepatitis B are an inflammation of the liver and a mild flu-like illness. Hepatitis B also may cause more serious liver disease and liver cancer, with approximately 10 percent of all hepatitis patients requiring hospitalization and less than 1 percent suffering a fatal deterioration of the liver function. In addition, by at least one estimate, 25 percent of those infected will become chronic carriers themselves.[3]
 
 
 11
 Although the transmission of hepatitis B is not fully comprehended, most medical experts agree that it is transmitted through body fluids, chiefly blood but also through saliva, tears, and seminal fluid, and not by casual contact. Infection occurs when contaminated body fluid comes into contact with breaks in the skin, even breaks too small to be visible to the human eye, or mucosal surfaces such as the mouth or eyes of an uninfected person. Not every contact with contaminated body fluids will result in infection, but a single exposure involves a 10-15 percent chance that the exposed person will become infected. More prolonged exposure increases the risk, and in the high risk groups--clients of mental institutions, promiscuous homosexual men, and intravenous drug users--the risk is nearly 100 percent.
 
 
 12
 Hepatitis carriers are not uniformly infectious. A carrier determined to be "e antigen positive" is three to four times more infectious than an "e antigen negative" carrier. (When Kohl first applied to Woodhaven, he tested e antigen positive, but is now e antigen negative.) An alteration in carrier status is not uncommon; however, only 1 percent of all carriers lose their infectiousness entirely each year.
 
 
 13
 An effective vaccine is available against hepatitis B. In the general population, it is approximately 90 percent effective, increasing to 95-99 percent effective with younger individuals and decreasing below 85 percent effective with individuals who are over the age of fifty, obese, or suffer from Down's Syndrome. The inoculation process requires a series of three shots given over a six-month period. A single booster shot is required every four to five years, or as often as every two years for those with Down's Syndrome. A small percentage of those inoculated will experience side effects of either mild discomfort or low-grade fever. A post-inoculation blood screening test can identify those individuals who have been successfully immunized. An unimmunized individual who is exposed to contaminated fluids may be treated with hepatitis B immune globulin, which, if properly administered within forty-eight hours, will prevent infection in 75 percent of the cases.
 
 
 14
 The cost of inoculation is currently between $150 to $175 per person, the cost of a booster shot approximately $50, and the cost of post-inoculation screening at least $20 to $25 per person. Immune globulin is also expensive. At the time Kohl applied to Woodhaven, none of the institution's staff or clients had been inoculated. WLC and WS have now inoculated all or almost all of their clients pursuant to a DMH program initiated in 1985. As of the date of the trial, the clients had not been screened to identify those who failed to develop immunity. The DMH program did not cover staff.
 
 
 15
 Assuming a total of 360 staff members and a combined cost of $200 to inoculate and screen each individual, to inoculate and screen all the staff at Woodhaven would cost approximately $72,000 initially for the serum and lab tests alone, not including booster shots. Because the yearly staff turnover rate is 75 percent at WLC and 50 percent at WS, each would have an additional yearly cost of $45,000 and $6,000, respectively, to inoculate new staff. The district court proposed inoculating only a small portion of the total Woodhaven staff, at an initial cost of roughly $8,100 and a yearly cost of $5,000 thereafter.
 
 III.
 
 16
 Woodhaven's first argument on appeal is that the doctrine of primary jurisdiction precluded the district court from taking subject matter jurisdiction. See, e.g., United States v. Western Pacific R.R., 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). We disagree. When the DMH referred Kohl to Woodhaven, it performed its essential function and set these events in motion. There was no other issue that had to be resolved in the first instance by an administrative body of "special competence" that if unresolved would deprive the district court of subject matter jurisdiction. See id. at 64, 77 S.Ct. at 165.[4]
 
 IV.
 
 17
 Woodhaven's next argument is that its program is not the least restrictive environment for Kohl's care, as required by federal and Missouri law. See 42 U.S.C. Sec. 6009(2) (1988); Mo.Rev.Stat. Sec. 633.115 (1988). Woodhaven claims that Kohl's current residence, the Northwest Habilitation Center in St. Louis, where Kohl was transferred on March 10, 1987, is the least restrictive environment for him and can provide care superior to that available at Woodhaven.
 
 
 18
 When Kohl applied to Woodhaven early 1984, he was residing at Colonial Town, and Northwest Habilitation Center did not yet exist. Kohl's DMH case manager, Nancy Shrewsbury, referred Kohl to Woodhaven in 1983. Therefore, we cannot find clearly erroneous the district court's determination that Woodhaven was the proper residence for Kohl at that time.
 
 
 19
 An injunction is an equitable remedy shaped to right an ongoing wrong, however, and will not issue if it cannot serve a proper remedial purpose. A change in circumstances can destroy the need for an injunction. See Toussaint v. McCarthy, 801 F.2d 1080, 1090 (9th Cir.1986), cert. denied, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). The district court did not address the question of whether Northwest is a less restrictive environment than Woodhaven, nor can we make such a determination from the record. In an affidavit attached to Woodhaven's post-trial motion filed October 9, 1987, Ms. Shrewsbury states that according to an individual habilitation plan drawn up "on or about April 1, 1987," by the DMH agency responsible for community placement, Northwest is the least restrictive environment for Kohl. The affidavit also states that, contrary to Ms. Shrewsbury's testimony at trial, Kohl was not on a referral list for transfer to Woodhaven at the time of trial, although he was in 1983. If Kohl is currently in the least restrictive environment suitable for his care and is no longer being recommended by the DMH for transfer to Woodhaven, an injunction ordering such a transfer would serve no remedial purpose. On remand, the district court should determine whether Northwest is in fact the least restrictive environment for Kohl. Cf. Ruffalo v. Civiletti, 702 F.2d 710, 719 (8th Cir.1983).
 
 V.
 
 20
 Congress enacted the Rehabilitation Act in order to "develop and implement, through research, training, services, and the guarantee of equal opportunity, comprehensive and coordinated programs of vocational rehabilitation and independent living, for individuals with handicaps in order to maximize their employability, independence, and integration into the workplace and the community." 29 U.S.C. Sec. 701 (1988). The Act provides that institutions receiving federal funds may not discriminate against individuals classified as handicapped solely on the basis of their handicap if the individual is otherwise qualified to participate in the institution's programs. See 29 U.S.C. Sec. 794.
 
 
 21
 Although WLC and WS concede receiving federal financial assistance, they argue that Kohl is not handicapped within the meaning of the Act; that if he is handicapped because of his carrier status, he was not excluded solely for that reason; and that even assuming both of the foregoing, he is not otherwise qualified for the Woodhaven programs. The district court resolved these issues in favor of Kohl.
 
 
 22
 A. Kohl is Handicapped Within the Meaning of the Act
 
 
 23
 The statute defines an individual with handicaps as "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. Sec. 706(8)(B) (1988).
 
 
 24
 The district court found that hepatitis B is a physical impairment affecting one or more of Kohl's major life functions and that Kohl has a record of physical impairment. Although Woodhaven strenuously argues, and not without substantial support in the record, that Kohl does not have a physical impairment, we will accept the district court's finding as not clearly erroneous for the purposes of this appeal. Accordingly, we need not address the district court's additional finding that Kohl is handicapped as a result of his carrier status regardless of whether being a carrier causes him physical impairment. Cf. School Bd. of Nassau County, Florida v. Arline, 480 U.S. 273, 107 S.Ct. 1123, 1128 n. 7, 94 L.Ed.2d 307 (1987).
 
 
 25
 B. Woodhaven Rejected Kohl Solely Because of His Carrier Status
 
 
 26
 The district court found that Woodhaven had discriminated against Kohl "solely by reason of" his carrier status. Woodhaven contends that Kohl was excluded for other reasons as well.
 
 
 27
 On September 10, 1984, James Michael, the assistant executive director of WLC, wrote Kohl's case manager at the DMH that Kohl had been found "appropriate" for the Woodhaven programs, but that WLC could not take him because WS had refused him and WLC would therefore be unable to provide for him during the day. WS rejected Kohl, according to Michael's letter, because its staff had not been inoculated and screened. Other communications from WLC made it clear that Kohl's contagiousness, and not the lack of a day program, was the reason for his exclusion. In May and in July of 1985, WLC informed Kohl's parents that Kohl could return when the immunization of WLC's clients and staff was completed. Charles Brewer, the executive director of WLC, wrote Kohl's parents that it was WLC's "policy" to refuse hepatitis carriers until the staff was inoculated. Kohl's maladaptive behavior was never mentioned in these communications.
 
 
 28
 WS also acknowledged that Kohl was an appropriate candidate for its program but that he would not be admitted because of his carrier status and his maladaptive behavior. The executive director of WS, in his report for November 21, 1985, stated that "we have requested funding to screen and innoculate [sic] staff expected to work with the active carrier of hepatitis B. The referral (or funding) agency has balked at this request, and as a result, we have not admitted an infectious carrier in our program."
 
 
 29
 Woodhaven now offers four reasons for rejecting Kohl other than his carrier status: (1) because his maladaptive behavior increased the risk of contagion, (2) the maladaptive behavior itself, (3) the fact that the staff was not immunized, and (4) WLC could not accept Kohl unless WS did. All of these rationales, with the exception of Kohl's maladaptive behavior itself, boil down to Kohl's being a carrier. Kohl's behavior and the non-inoculation of the staff are irrelevant except as they pertain to the risk of infection. WLC's argument that it rejected Kohl because of the lack of a day program is not persuasive, as Kohl was rejected from WS because of his infectiousness, and is also belied by the fact that WLC represented to Kohl's parents that Kohl could return when its staff was immunized.
 
 
 30
 Woodhaven argues that the presence of a hepatitis B carrier at WS conclusively establishes that Kohl was excluded because of his maladaptive behavior; however, there is no indication that Woodhaven knew that this individual was a carrier when admitted, and in fact the opposite seems to be true. The district court found that because other maladaptive clients were accepted, neither institution had rejected Kohl because of his maladaptive behavior. We find Woodhaven's post-act rationales unpersuasive, and we hold that the district court's finding of exclusively discriminatory intent is not clearly erroneous.[5] See Norcross v. Sneed, 755 F.2d 113, 119 (8th Cir.1985).
 
 
 31
 C. Otherwise Qualified-Reasonable Accommodation
 
 
 32
 The district court found that Kohl was otherwise qualified for the Woodhaven programs and that Woodhaven could reasonably accommodate him. The two concepts are related: if a handicapped individual cannot be reasonably accommodated, then he cannot be otherwise qualified. "A person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk." Arline, 107 S.Ct. at 1131 n. 16.
 
 
 33
 Arline sets out a two-part test for determining whether a contagious individual is otherwise qualified. First, the district court must analyze the following four factors to assess the threat to others: " '(a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long the carrier is infectious), (c) the severity of the risk (what is the potential harm to third parties), and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm.' " Arline, 107 S.Ct. at 1131 (citation omitted). In evaluating these factors, "courts normally should defer to the reasonable medical judgments of public health officials." Id.
 
 
 34
 If the individual is found to pose a significant risk to others, the second part of the test is whether the accommodation necessary to eliminate that risk is reasonable. Id. "Accommodation is not reasonable if it either imposes 'undue financial and administrative burdens' on a grantee, or 'requires a fundamental alteration in the nature of [the defendant's] program.' " Id. 107 S.Ct. at 1131 n. 17 (quoting Southeastern Community College v. Davis, 442 U.S. 397, 412, 99 S.Ct. 2361, 2370, 60 L.Ed.2d 980 (1979)). It is "for the court to evaluate, in light of these medical findings," whether the recipient of federal funds can reasonably accommodate the individual with handicaps. Id. 107 S.Ct. at 1131.
 
 
 35
 We conclude that the district court misapplied the Arline test in two ways. First, the district court commingled the two parts of the test, analyzing the nature of the risk to others only after assuming its recommended accommodations were in place. Second, the district court paid unwarranted deference to the opinion of a particular health official as to what accommodations were reasonable.
 
 
 36
 The nature of the risk in the present case is the possibility of infection with hepatitis B through the transfer of body fluids. Not every contact with contaminated body fluids will result in infection, but on the scale of infectious diseases devised by the American Public Health Association, ranging from 1 (polio) to 5 (common cold), with 1 being the most infectious, hepatitis is designated as a Class 2A disease, akin to typhoid fever and diphtheria. A single exposure to hepatitis B contaminated blood on a mucous membrane or small break in the skin results in a 10-15 percent chance of infection, as compared with a less than 1 percent chance of infection of AIDS for the same exposure. See Brief of the American Medical Association as Amicus Curiae, at 2-4.
 
 
 37
 The duration of carrier status varies, as does the level of infectiousness, but many carriers remain contagious throughout their lifetimes, with only 1 percent losing their carrier status per year. See Kohl, 672 F.Supp. at 1242. Although Kohl's infectiousness has decreased from e antigen positive to e antigen negative, he is still a carrier, and was in fact more highly contagious when Woodhaven rejected him than he is now.
 
 
 38
 The severity of the risk is grave, for although the majority of those infected will suffer only flu-like symptoms, ten percent will require hospitalization, and a very few, less than one percent of those infected, will suffer a fatal deterioration of the liver function. These figures may be underinclusive. See Glover v. Eastern Nebraska Community Office of Retardation, 686 F.Supp. 243, 246 (D.Neb.1988) (the disease will be fatal to one percent or less, but another approximately four percent will die within 5 to 25 years of cirrhosis of the liver).
 
 
 39
 The probability that the disease will be transmitted and cause varying degrees of harm must be considered high. Because of Kohl's maladaptive behavior, there is a substantial likelihood that others could come into contact with his body fluids. Kohl averages several acts of aggression against the staff and several acts of self abuse per day. On at least one occasion during Kohl's evaluation at Woodhaven, staff members came into contact with Kohl's blood after he inflicted an injury upon himself.
 
 
 40
 The district court did not reach a conclusion as to whether Kohl posed a significant risk to others, focusing instead on considerations of how the risk could be minimized. The district court found that a combination of the vaccine that generally confers immunity to roughly 90 percent of those inoculated, the screening test to determine who has been successfully immunized, and the post-exposure prophylaxis hepatitis B immune globulin would "provide a means for eliminating virtually any potential harm to third parties posed by [Kohl]."
 
 
 41
 Discussing the probability that clients or staff will be infected, the fourth factor of the Arline test, the district court noted that by the time of the trial all the clients at WLC had been or were being inoculated, as had all but three clients of WS. The district court recommended that those three clients be inoculated and that all the clients be screened.
 
 
 42
 To protect the staff from the threat of infection, the district court's plan called for creating "a barrier of protection" around Kohl by inoculating and screening those staff members who would routinely deal with Kohl and by also immunizing a small number of supervisors or other staff who would function as "backup in an emergency situation." Unimmunized staff would be trained to avoid giving assistance to Kohl in emergencies in favor of allowing an immunized staff member to do so. The janitorial and housekeeping staff could minimize, but not eliminate, their risk of infection by wearing gloves, and Kohl's laundry could be marked to alert laundry workers to wear gloves when handling it. One expert also suggested immunizing the monitors on the bus Kohl would ride from WLC to WS. The district court concluded that such a plan would "eliminate any significant risk of [Kohl's] transmitting hepatitis B."
 
 
 43
 Concluding its reasonable accommodation analysis, the district court found that the cost of its plan would be reasonable. The district court foresaw an initial cost to WLC of $6,500 and an annual cost of $4,400 a year thereafter. The district court found that this cost was not an "undue financial burden" on WLC in light of its $4 million annual budget. Similarly, the district court found an initial cost of $1,600 and yearly costs of $400 to $600 to Woodhaven insignificant in light of its $1.1 million budget.
 
 
 44
 Before discussing the merits of the district court's plan, it should first be pointed out that the plan's costs are deceptively low. The district court considered only the cost of the medical supplies and lab tests necessary to inoculate and screen the direct contact and backup staff. Many obvious costs were not considered, including the cost of inoculating and screening additional staff to replace the ten percent who do not develop immunity, the cost of screening the clients, the cost of administering the shots and tests, and the cost of the regular booster shots. Because of the long time lag necessary to immunize new staff (seven and one-half to nine months), the district court underestimated the number of backups required to insure adequate emergency protection in the situation in which a staff member is replaced.[6] These omissions are far from insubstantial.
 
 
 45
 Courts are prohibited from requiring a fundamental alteration in a defendant's program to accommodate an individual. See Arline, 107 S.Ct. at 1131 n. 17; Davis, 442 U.S. at 412, 99 S.Ct. at 2370. We conclude that the district court minimized the administrative burden of reassigning away from Kohl those staff members and clients who do not develop immunity and gave no weight to the degree Woodhaven's programs would be disrupted by its plan.
 
 
 46
 In formulating its accommodation plan, the district court relied almost entirely on the testimony of Dr. Denny Donnell, with some corroboration from Dr. Robert Perrillo. Dr. Donnell is the manager of the section of Epidemiology Services, Missouri Department of Health. Dr. Perrillo is a private physician called as an expert by Kohl. The district court stated that Arline requires that " 'courts normally should defer to the reasonable medical judgments of public health officials.' Arline, 107 S.Ct. at 1131. The public health official who testified in this case was Dr. Donnell." Kohl, 672 F.Supp. at 1244. We find that the question of deference cannot be so easily resolved. We do not read Arline as requiring courts to give decisive weight to any public health official's testimony simply by virtue of his position. The official must have particular knowledge relevant to the issue in question.
 
 
 47
 Dr. Donnell is an expert on communicable disease generally, but he has never visited Woodhaven, was entirely unfamiliar with its programs, and has never examined Kohl. His testimony that it would be adequate to inoculate the direct contact staff alone was hypothetical. As the issue of a limited inoculation plan was central to the trial and was sharply contested, Dr. Donnell's testimony could hardly be given determinative weight. Other considerations also dictate against finding Dr. Donnell's testimony controlling. In deciding section 504 cases, courts may be called upon to balance deference to health authorities with the deference due to the reasonable judgments of the administrators most familiar with the program under examination. See Strathie v. Dep't of Transp., 716 F.2d 227, 231 (3d Cir.1983); Doe v. New York Univ., 666 F.2d 761, 776 (2d Cir.1981). Dr. Clarence Pickard, the medical director at WLC, challenged Dr. Donnell's proposal as unsafe. Dr. Pickard also testified that Dr. Donnell, calling from the Department of Health prior to trial, had recommended that Dr. Pickard have the entire Woodhaven staff inoculated.
 
 
 48
 The evidence also revealed that a second public health authority has taken a position directly contrary to Dr. Donnell's. The DMH itself requires that all staff in state-run mental facilities, including secretaries and other noncontact personnel, must be inoculated or sign a release in order to continue working. The Missouri Legislature found the need to inoculate all state staff so urgent that it authorized an "emergency appropriation" of more than $1 million to accomplish the task. See Kohl, 672 F.Supp. at 1231. Although state mental facilities commonly have a substantially greater number of clients with hepatitis than Woodhaven would have, the DMH's policy must be given some consideration, for it is hard to conceive of a rationale that would justify requiring more protection for state mental health staff than their private counterparts.
 
 
 49
 Furthermore, Arline specifically requires deference to public health officials in the ordinary course only when ascertaining the risk to others under the first part of the test. See Arline, 107 S.Ct. at 1131. In the "next step," it "is for the court to evaluate, in light of these medical findings, whether the employer could reasonably accommodate the employee under the established standards for that inquiry." Id.; see also Chalk v. United States District Court, 840 F.2d 701, 711 (9th Cir.1988) (the "district court is in the best position, guided by qualified medical opinion, to determine what reasonable procedures, * * * will best give assurance * * * that no significant risk of harm will arise"). The question whether all significant risks have been eliminated is not a purely medical one. Although medical testimony may be helpful, the court cannot remove itself from this inquiry. The court is not relegated to merely determining whether the financial and administrative cost is reasonable, but also must be satisfied that the significant risks to others are removed.
 
 
 50
 Dr. Donnell acknowledged that the DMH's general policy was that all staff at institutions for the mentally retarded should be inoculated, but that under certain circumstances, particularly when there was only one carrier at the institution, inoculation of only the direct contact staff could suffice. Dr. Donnell testified, "Well, in a general way, the extent to which vaccine would be necessary or appropriate would be to protect those people * * * who would have the continuous and direct contact with the carrier" and that such a measure "for that set of people * * * would provide protection for them." Others beside the direct contact staff faced the possibility of a single exposure during some unforeseen crisis, Dr. Donnell explained, but a single exposure entails a smaller risk of infection.
 
 
 51
 Dr. Donnell also testified that a carrier who exhibited aggressive maladaptive behavior such as Kohl's would pose a greater risk than a calm or passive carrier. When asked what his recommendation was in the situation where all staff members are trained and required to respond to any emergency, as the staffs at Woodhaven are, Dr. Donnell testified that any staff member who might have to respond to an emergency should be inoculated. Alternatively, Dr. Donnell suggested that staff members be trained not to assist in the handling of Kohl in emergencies.
 
 
 52
 Dr. Perrillo, who admitted that he was unfamiliar with Woodhaven and Kohl and who based his recommendations on assumptions about both, supported the possibility of a limited inoculation plan. He also testified that "it's ideal for you to vaccinate all individuals who work at [a mental institution]," but that "I know why we're here today, and it's somewhat a question of cost." Dr. Perrillo agreed with Dr. Donnell that unimmunized staff would have to be trained not to assist in the handling of Kohl, because anyone who might be required to give emergency aid to Kohl "[n]eeds to be [inoculated]."
 
 
 53
 Dr. Perrillo also pointed out several pitfalls with the limited inoculation plan. Because the entire inoculation process can take up to nine months--three shots over six months and a screening test six to twelve weeks later--and because the staff turnover rate at WLC is 75 percent per year and 50 percent per year at WS, additional staff beyond direct contacts and backups would have to be inoculated to insure that there was always adequate backup. In order to avoid immunizing new staff who might leave either before or shortly after becoming immune, Dr. Perrillo recommended that no new staff be assigned to Kohl's building until they indicated or demonstrated that they intended to work at Woodhaven for a substantial period of time. Dr. Perrillo stated that it would be impossible to immunize short-term replacements.
 
 
 54
 An additional problem would be that of arranging for the continuing treatment of those clients who failed to develop immunity. Dr. Perrillo cautioned that these clients, who could number 15 percent or more of the entire client population, as it includes a significant number of individuals with Down's Syndrome, should be isolated from Kohl. Dr. Perrillo acknowledged that isolation is "sometimes difficult to do in a classroom environment."
 
 
 55
 Testifying for Woodhaven were Dr. Michael Cooperstock and Dr. Clarence Pickard. Dr. Cooperstock testified that Kohl's presence at Woodhaven would pose "slight but definitely increased" risk to all staff and not just the direct contact staff, and indicated that anyone who might be called to come into contact with Kohl during an emergency faced a heightened risk of infection. Dr. Cooperstock also testified that 10 percent of those infected will require hospitalization. Dr. Pickard testified that Kohl endangered all unimmunized staff. Dr. Pickard, who has served as the medical director at WLC since 1986, stated that he would recommend that any employee trained to respond to an emergency be inoculated, as well as any employee who could reasonably be expected to come into contact with Kohl.
 
 
 56
 After reviewing the record, we are left with a firm conviction that the limited inoculation plan would expose the Woodhaven staff to an unreasonable risk. Both Woodhaven facilities are open and allow clients full access to all areas of their facilities. At WLC there are many large group activities including choir, dances, bible study, religious services, and recreation. The clients have free access to the nursing station, gymnasium, and swimming pool, as well as the administrative offices. WLC also gathers all clients and staff together twice a week for meetings. At WS the clients freely intermingle during breaks from classes. In this setting, it is impossible to isolate Kohl or to insure that unimmunized staff will not be required to give assistance in emergencies involving Kohl. The fact that there is another hepatitis B carrier at WS does not establish that Kohl could be reasonably accommodated, because the other carrier is much less severely retarded and exhibits no maladaptive behavior. Even attempting to isolate Kohl would be a fundamental alteration in Woodhaven's open program and would deny Kohl one of the most important therapeutic benefits of the Woodhaven program, that of social interaction with others. In addition to the fact that instructing unimmunized staff not to assist in emergencies involving Kohl is conceivably dangerous, a Woodhaven official testified that a staff member's refusal to give reasonable care to a client in a situation amounting to neglect of that client could result in a review of Woodhaven's license. Although Kohl's behavior had improved measurably after his time at Woodhaven, he was still given to daily acts of aggression against the staff and daily acts of self-abuse, in one instance inflicting a serious injury to his own eye, causing staff members who assisted him to come into direct contact with his blood. Given the open environment at Woodhaven and Kohl's unpredictable and violent nature, it is inevitable that unimmunized staff would eventually be exposed to a significant risk of infection.
 
 
 57
 We cannot consider a 10-15 percent chance of infection so small as to be insignificant. This is particularly true since the immune globulin post-exposure treatment is only 75 percent effective under the best circumstances. Protecting 3 out of 4 unimmunized staff members is not equivalent to "eliminat[ing] any significant risk," as the district court found. This risk is unacceptable. See Arline, 107 S.Ct. at 1131 n. 16 ("[a] person who poses a significant risk of communicating an infectious disease will not be otherwise qualified for his or her job if reasonable accommodations will not eliminate that risk"); Davis, 442 U.S. at 409, 99 S.Ct. at 2368 (in implementing the mandate of section 504 the courts must ensure the safety of third parties); Doe, 666 F.2d at 775 (a recipient of federal funds "need not dispense with reasonable precautions * * * for safe participation * * * in its activities"). Enforcement of section 504 cannot entail exposing third parties to significant risks. See Arline, 107 S.Ct. at 1131 n. 16 ("[t]he Act would not require a school board to place a teacher with active, contagious tuberculosis in a classroom"); Doe, 666 F.2d at 777 ("[i]t would be unreasonable to infer that Congress intended to force institutions to accept or readmit persons who pose a significant risk of harm to themselves or others"). On the other hand, the medical testimony indicates that inoculating the staff who could reasonably come into contact with Kohl or who would be required to assist him should an emergency arise would eliminate any significant risk of infection. See Chalk, 840 F.2d at 708 (plaintiff permitted to reassume teaching position when the "overwhelming consensus of medical opinion" was that he posed no significant risk to others).
 
 
 58
 In the light of the contradiction between Dr. Donnell's proposal and the DMH's procedures, the hypothetical nature of Dr. Donnell's proposed plan, and the unanimity of opinion among all the medical experts, including Dr. Donnell, that it was preferable to inoculate all the staff that could reasonably come into contact with Kohl, we conclude that the district court erred in finding that limited inoculation would eliminate all significant risk. Therefore, regardless of the cost of the plan, which was seriously understated, a program of limited inoculation cannot reasonably accommodate Kohl. The evidence and testimony established that to eliminate all significant risk of infection, all staff who reasonably could come into contact with Kohl should be inoculated.
 
 
 59
 The district court's order granting injunctive and declaratory relief is reversed, and the case is remanded to the district court for further proceedings consistent with the views set forth in this opinion.[7]
 
 
 60
 In view of our disposition of the appeal, we need not consider the cross-appeal on the question of attorneys' fees and costs.
 
 
 61
 McMILLIAN, Circuit Judge, concurring in part and dissenting in part.
 
 
 62
 I concur in Part III (jurisdiction), Part IV (appropriate residence), Part V-A (Kohl is handicapped within the meaning of the Rehabilitation Act), and Part V-B (Kohl was rejected for placement at Woodhaven solely because of his status as a carrier of Hepatitis B). For the reasons discussed below, I respectfully dissent from the majority decision in part V-C that Kohl is not an "otherwise qualified handicapped individual" within the meaning of Sec. 504 of the Rehabilitation Act (Act), 29 U.S.C. Sec. 794. I also dissent from that portion of the majority opinion affirming the district court's denial of attorneys' fees to Kohl.
 
 
 63
 The majority criticizes the district court for "commingling" the two parts of the test set forth in School Board v. Arline, 480 U.S. 273, 107 S.Ct. 1123, 1131, 94 L.Ed.2d 307 (1987) (Arline ). I disagree with this characterization of the district court's analysis. The district court carefully considered the four risk factors set out in Arline, alone and in conjunction with the accommodations suggested by plaintiff. See Kohl v. Woodhaven Learning Center, 672 F.Supp. 1226, 1230-34, 1241-48 (W.D.Mo.1987) (Kohl ).
 
 
 64
 As is required by Arline, the district court made a detailed factual inquiry into the risk to others posed by plaintiff because of the nature of his disease, i.e., the manner in which Hepatitis B is transmitted; the duration of the risk of transmission; the severity of the risk if the disease is transmitted; and the probability that the disease will be transmitted as well as the probability that varying degrees of harm will be caused if it is transmitted. Id. These factual findings are entitled to great deference on appeal and should be affirmed unless they are clearly erroneous. Fed.R.Civ.P. 52(a). The majority restates the factual findings of the district court and then complains that the district court did not conclude that plaintiff posed a significant risk to others. The majority contends that the district court only analyzed the risk in terms of the accommodations proposed by plaintiff.[1]
 
 
 65
 A close reading of the case that the majority relies upon in support of its view that the risk posed by plaintiff has been understated, Glover v. Eastern Nebraska Community Office of Retardation, 686 F.Supp. 243 (D.Neb.1988) (Glover ), lends support to the district court's conclusion that the proposed accommodations are reasonable. Glover held that a policy requiring mandatory screening of direct care employees for the Hepatitis B virus is not justified in light of the fourth amendment proscription against unreasonable searches and seizures. The district court reached this result despite the risk posed to mentally retarded individuals by carriers of the Hepatitis B virus. Id. at 251. Despite its recognition that there was a danger of maladaptive behavior such as scratching or biting which creates a risk of transmission, the district court specifically found that there were prophylactic measures available sufficient to prevent the spread of Hepatitis B such as vaccine and immune globulin as well as behavior management and passive restraint skills which were practiced by the staff. Id. at 245-46, 247.
 
 
 66
 Here, the district court necessarily found that plaintiff posed a significant risk to third persons; otherwise it would have been unnecessary to reach the second part of the Arline test--that of analyzing whether plaintiff could be reasonably accommodated by Woodhaven. The question of reasonableness involves a judgment by the district court of whether the proposed accommodations can realistically be implemented in such a way as to minimize the risk to an acceptable level given the particular circumstances of the case. Arline, 107 S.Ct. at 1131 & n. 17.
 
 
 67
 In making the reasonableness determination required by Arline, the district court did consider the nature of the risk to others after assuming that the recommended accommodations were in place. Kohl, 672 F.Supp. at 1241-48. For example, the district court considered the lessening in severity and frequency of plaintiff's aggressive behaviors while residing at Woodhaven in determining the risk of transmission of Hepatitis B to others. From this, the district court concluded that the proposed accommodations would adequately protect third parties from infection. Id. at 1242. It is unclear to me how else the recommended accommodations could be analyzed for their reasonableness. What the majority criticizes as a misapplication of the Arline test is, in reality, a carefully considered analysis of the various risk factors in this particular case as well as the risk-minimizing effect of the accommodations recommended by plaintiff and his experts.
 
 
 68
 In holding that the district court incorrectly found that the recommended accommodations are reasonable, the majority overemphasizes the cost to Woodhaven of implementing the proposals. It is true that an accommodation is not reasonable "if it either imposes 'undue financial and administrative burdens' on a grantee or requires 'a fundamental alteration in the nature of [the] program.' " Arline, 107 S.Ct. at 1131 n. 17 (quoting Southeastern Community College v. Davis, 442 U.S. 397, 410, 412, 99 S.Ct. 2361, 2370, 60 L.Ed.2d 980 (1979)). However, cost is but one consideration of many in the reasonable accommodation analysis. See Nelson v. Thornburgh, 567 F.Supp. 369, 381 (E.D.Pa.1983) ("preventing discrimination against the handicapped may mean that recipients of federal funds will have to expend funds of their own."), aff'd, 732 F.2d 146 (3d Cir.1984), cert. denied, 469 U.S. 1188, 105 S.Ct. 955, 83 L.Ed.2d 962 (1985).
 
 
 69
 Here, the district court found that the proposed accommodations would neither require a fundamental alteration in the nature of Woodhaven's program nor impose upon Woodhaven undue administrative or financial burdens. Kohl, 672 F.Supp. at 1246. It specifically found that the cost to Woodhaven of implementing the proposed accommodations would be minimal, even taking into account the high staff turnover rate at Woodhaven. The district court also found that by Woodhaven's own admission, one of its primary reasons for not admitting plaintiff to its program was the cost of inoculating its staff. Id. at 1237-38. Far too much emphasis is placed on the cost factor, both in the analysis of the majority and in the arguments made by Woodhaven.[2] The result is an unbalanced equation in which the rights of plaintiff are given far too little weight and the costs to Woodhaven of implementing the proposed accommodations are given far too much.
 
 
 70
 The majority also holds that the district court gave undue weight to the testimony of one of plaintiff's expert witnesses, Dr. Denny Donnell, Section Manager of Epidemiology for the Missouri Department of Health. The majority reasons that Arline instructs the trier of fact to "defer to the reasonable medical judgments of public health officials" only in the first step of the analysis and that the district court was therefore in error when it relied heavily on Dr. Donnell's testimony in analyzing the reasonableness of the proposed accommodations. Arline, 107 S.Ct. at 1131.
 
 
 71
 It is for the trier of fact to judge the credibility of a witness and to choose to believe all, none, or part of his or her testimony. Anderson v. City of Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) (Bessemer City ); Hylton v. John Deere Co., 802 F.2d 1011, 1014 (8th Cir.1986); Fed.R.Civ.P. 52(a). This proposition is so basic, it hardly needs citation.
 
 
 72
 Here, the district court clearly recognized that Arline instructs the trier of fact to defer to the judgments of public health officials when it is making the detailed factual findings that comprise the first part of the Arline test. We know that the district court recognized the distinction because it quoted from Arline to that effect. Kohl, 672 F.Supp. at 1244. We need not be concerned, then, that the district court paid any more deference to Dr. Donnell's testimony regarding the reasonableness of the proposed accommodations than it would have had the Arline court remained completely silent on this issue. I do not read the opinion of the district court to mean that it believed it was compelled to give decisive weight to Dr. Donnell's testimony.
 
 
 73
 However, the fact that the district court gave great weight to Dr. Donnell's testimony should come as no surprise. He is an expert in the field of epidemiology, a field specifically concerned with the control of the spread of disease in the population. Further, Dr. Donnell's testimony is supported by that of Dr. Robert Perillo, another expert who testified for plaintiff. Dr. Perillo is an associate professor of medicine at Washington University Medical School in St. Louis, Missouri. He specializes in research in Hepatitis B, including the epidemiology of the disease. These two experts testified that, given the nature of the risk posed by plaintiff to other persons in the context of being housed in a residential facility for the mentally retarded, a "barrier of protection" could be built around plaintiff, primarily by inoculating those staff members who would come into contact with him.[3] Kohl, 672 F.Supp. at 1244.
 
 
 74
 Dr. Donnell also testified that the Missouri Department of Health guidelines for the vaccination of staff working in facilities for the mentally retarded are "conditionally stated." The two factors cited by Dr. Donnell which affect whether an institution should expect to vaccinate its entire staff are the number of carriers of Hepatitis B in the institutional population and the likelihood of transmission by those carriers. The plaintiff would be the only carrier of Hepatitis B at Woodhaven. Kohl, 672 F.Supp. at 1232. Dr. Donnell's testimony that a "barrier of protection could be built around plaintiff is consistent with the Department of Health guidelines.
 
 
 75
 The majority observes that the testimony of plaintiff's experts is based only on hypothetical questions and that they are unfamiliar with plaintiff and the physical environment at Woodhaven. A careful review of Dr. Perillo's testimony reveals, however, that his answers were in response to hypothetical questions that referred to the very specific conditions at Woodhaven. A properly phrased hypothetical question should result in an answer that validly reflects the reality of the situation. See Fed.R.Evid. 703 and comment.
 
 
 76
 The district court gave greater weight to the testimony of plaintiff's experts, one of whom is the Missouri state official in charge of the control of communicable diseases within the state. Beyond the obvious expertise possessed by Dr. Donnell, his was the most neutral expert testimony presented at trial. Woodhaven's expert witness, upon whom the majority would have the district court rely, is a Woodhaven employee who possesses the potential for bias in favor of his employer. It is not for this court to second guess the district court's decision to believe one expert witness over another where there is support in the record for that decision. Bessemer City, 470 U.S. at 575, 105 S.Ct. at 1512.
 
 
 77
 The district court made a detailed analysis of the risk posed by plaintiff and carefully considered whether the proposed accommodations are reasonable in terms of the degree of protection they would provide to others, the disruption they may cause to Woodhaven's programs, and the cost of implementing them. The district court concluded that because the proposed accommodations are reasonable, plaintiff is an "otherwise qualified handicapped individual" within the meaning of Sec. 504 of the Act. I would affirm that portion of the district court's opinion.
 
 
 78
 On cross-appeal, I would reverse the district court's decision not to award attorneys' fees to plaintiff under 29 U.S.C. Sec. 794a(b). One who successfully obtains court-ordered injunctive relief in a civil rights case "should ordinarily recover an attorneys' fee unless special circumstances would render such an award unjust." Newman v. Piggie Park Enterprises, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968). The cost of compliance with court-ordered injunctive relief is not a "special circumstance" which justifies denial of attorneys' fees to a prevailing plaintiff. Robinson v. Kimbrough, 652 F.2d 458, 467 (5th Cir.1981). Nor is the financial condition of the defendant. Entertainment Concepts, Inc. v. Maciejewski, 631 F.2d 497, 507 (7th Cir.1980), cert. denied, 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981). Accordingly, I would remand this case to the district court with directions to make findings on reasonable attorneys' fees and costs and to award same to plaintiff.
 
 
 
 [1]
 The Honorable Scott O. Wright, Chief Judge, United States District Court for the Western District of Missouri
 
 
 [2]
 We are indebted to the American Medical Association for its excellent amicus curiae brief, which is the source of much of our information on hepatitis
 
 
 [3]
 There is some disagreement as to the long-term effects of hepatitis B. After trial on a similar matter, the District Court of Nebraska reported that 95 percent of all those infected "will fully recover. Of the remaining five per cent (5%), the disease will be fatal to ten to twenty per cent of these individuals, while the others will develop chronic hepatitis involving slow, gradual liver damage and will die some five to twenty five years later from cirrhosis." Glover v. Eastern Nebraska Community Office of Retardation, 686 F.Supp. 243, 247 (D.Neb.1988). Dr. Michael Cooperstock, an expert medical witness called by Woodhaven, testified that one quarter of all those infected will become chronic carriers and that a certain percentage of these individuals will ultimately die of liver cancer
 
 
 [4]
 We agree with the district court that Woodhaven waived its exhaustion-of-administrative-remedies argument
 
 
 [5]
 If on remand the district court determines that Kohl cannot be reasonably accommodated and therefore is not otherwise qualified for the Woodhaven programs, see Arline, 107 S.Ct. at 1131 n. 16, this finding is rendered nugatory. See Pushkin v. Regents of Univ. of Colorado, 658 F.2d 1372, 1385 (10th Cir.1981)
 
 
 [6]
 In an affidavit attached to Woodhaven's post-trial motion, Charles Brewer, executive director of WLC, stated that the district court omitted from its calculations a number of staff members who would have direct care responsibility for Kohl and that it is customary to pay staff a 33 percent pay hike for undertaking undesirable assignments. The district court declined to consider this evidence since it could have been presented at trial. See 9 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2582 (1971)
 
 
 [7]
 We call the district court's attention to consideration of the Civil Rights Restoration Act of 1987 as it pertains to accommodation of individuals handicapped by contagious diseases. See, e.g., The Intent of the Harkin/Humphrey Amendment to S. 557, the Civil Rights Restoration Act, 134 Cong.Rec. S1738 (March 2, 1988) (statement of Sen. Harkin)
 
 
 [1]
 The majority concludes that "protecting three out of four unimmunized staff members is not equivalent to 'eliminating any significant risk.' " Majority op. at 941. This may be a misinterpretation of the statistics on the reliability of the post-exposure treatment. The chance of infection upon exposure is ten to fifteen percent, and the post-exposure treatment is seventy-five percent effective against infection. The seventy-five percent figure should be applied only to those ten to fifteen percent who might become infected without any protection. Under this analysis, only 2.5 percent of the unimmunized staff members who were exposed to the virus and who received the post-exposure immune globulin within 48 hours of exposure would become infected. An even smaller percent would develop a serious form of the disease. Therefore, the district court was correct in holding that the "barrier of protection" proposed by plaintiff and his experts would eliminate any significant risk of transmission of the virus to unimmunized staff members. Kohl, 672 F.Supp. at 1243
 
 
 [2]
 In assessing the cost to Woodhaven of implementing the proposed accommodations, the majority relies in part on evidence not properly before this court. See majority opinion at 938 n. 6
 
 
 [3]
 Inoculation of all Woodhaven clients is at least near completion. Kohl, 672 F.Supp. at 1243-44